**In re MID–AMERICAN WASTE SYSTEMS, INC., et al., Debtors.**

**No. 97–104 (PJW).**

United States Bankruptcy Court, D. Delaware.

Sept. 18, 2002.

---

Philip F. Downey, Vorys, Sater, Seymour and Pease, LLP, Columbus, OH, Christopher S. Sontchi, Ashby & Geddes, Wilmington, DE, for Christopher L. White.

John E. James, Laurie Selber Silverstein, William A. Hazeltine, Potter, Anderson & Corroon, LLP, Wilmington, DE, for Hobart G. Truesdell, Plan Administrator for Mid–American Waste Systems, Inc.

## OPINION

PETER J. WALSH, Chief Judge.

Before the Court is the objection of the Plan Administrator of Mid–American

Waste Systems, Inc.[1] ("Mid–American" or "Debtor") to the proof of claim filed by Christopher L. White ("White") (claim No. 00420) for the payment of salary and other fringe benefits (the "Employment Claim"). The Employment Claim was originally filed in the amount of $5,863,115.26. As a result of this Court's January 3, 2001 opinion and order in this matter, at the subsequent trial White reduced his claim to $884,500. The Plan Administrator challenges the amount and validity of the Employment Claim and asserts that any allowed portion of the Employment Claim should be equitably subordinated pursuant to 11 U.S.C. § 510(c)(1).[2] The parties submitted a joint pre-trial order[3] and an evidentiary hearing was held October 23, and 24, 2001.[4] Subsequently the parties submitted post-trial briefs[5] and proposed findings of fact and conclusions of law.[6] For the reasons discussed below, I conclude that equitable subordination of the Employment Claim pursuant to § 510(c) is appropriate in this case. While I will briefly revisit the rulings I made at trial regarding the maximum amount of the Employment Claim, this opinion focuses on the issues related to equitable subordination under § 510(c).[7] This opinion will

1. The Plan Administrator's objections to the White claim are: (1) Mid–American Waste Systems Inc.'s Second Objection to Proofs of Claim of Former Officers and Directors dated April 23, 1998 (Doc. 780, original entry Doc. 778) and (2) Mid–American's Supplemental Objections to Claim Number 00420 of Christopher L. White (Doc. 902, original entry Doc. 900).

2. Hereinafter, unless otherwise indicated, all references to "§ ____" are to a section of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

3. Joint Pre–Trial Order (Doc. 1128)

4. Both live and deposition testimony was presented at the hearing. The following witnesses gave testimony:
Live:
Christopher L. White ("White"): Former CEO, President and Chairman of Board of Directors for Mid–American.
Deposition:
Gene Meredith ("Meredith"): Chairman and CEO of Mid–American from February 1996 until fall of 1997. Board member since November 1995. Mr. Meredith has an extensive management and operational background in the waste management industry.
Thomas Brown ("Brown"): A director of Mid–American since 1990.
Jack Bjerke, Esq. ("Bjerke"): Corporate Counsel to Mid–American. Kept the minutes of all Board Minutes.
Grant Troja ("Troja"): A director of Mid–American since 1994. Former CFO of Coca Cola Bottling Group.

Martin Garcia ("Garcia"): A director of Mid–American since November 1995. Former litigation attorney.
Richard Puricelli ("Puricelli"): A director of Mid–American since November 1995. A former turn-around consultant.
Citations to the transcript will be in the form: (Tr. Name, Page:Line.)
Citations to admitted exhibits will be:
White's Exhibits: (White # )
Plan Administrator's Exhibits: (PA # )

5. Opening Post–Trial Brief Of Christopher L. White ("White's Opening Br.") (Doc. 1140)

Post–Trial Answering Brief Of The Plan Administrator In Opposition To The Claim Of Christopher L. White ("PA's Answering Br.")(Doc. 1142)
Post Trial Reply Brief Of Christopher L. White ("White's Reply Br.") (Doc. 1143)

6. Christopher L. White's Proposed Findings Of Fact And Conclusions Of Law (Doc. 1144)

The Plan Administrator's Proposed Findings of Fact and Conclusions of Law (Doc. 1145)

7. The Debtor's Amended Joint Liquidating Plan of Reorganization (the "Plan") was confirmed by order of this Court on September 17, 1997. (Doc. 544). Treatment of Class 4–C, General Unsecured Claims, is outlined on page 25 of the Plan and page 4 of the Disclosure Statement (Doc. 389). Based on those documents, the equitable subordination of the Employment Claim to Class 4–C, General Unsecured Claims, indicates no recovery for White. According to the Disclosure State-

serve as the Court's findings of facts and conclusions of law pursuant to Fed. R. Bankr.P. 7052.

## BACKGROUND

White is the former Chief Executive Officer, President and Chairman of the Board of Directors of Mid–American (Joint Pre–Trial Order at 2, § III.1—Stipulations; Tr. White 12:15–19). White was President of Mid–American from 1986 until February 6, 1996 (Tr. White 8:23–9:8, 9:20–10:2) and was a director of the company from at least 1990 until April 12, 1996. (Tr. Brown 119:11–13, 135:2–8). Mid–American was primarily engaged in the collection and disposal of non-hazardous waste. (Tr. White 7:17–19).

*The Hayes Bribe and the Bribery Investigation*

Several plea agreements admitted into evidence show the following. On or about March 6, 1991, a $10,000 bribe was made by a Mid–American agent to Gerald Hayes ("Hayes"), a city councilman for the city of Gary, Indiana (the "Hayes Bribe"). (PA 32 at ¶ 9(b)). The bribe was disguised as a transaction in which Mid–American Waste Systems of Indiana, Inc. ("Mid–American Indiana") purchased two vehicles from Hayes for $10,000. Both the Mid–American agent and White knew that these jeeps were in fact worthless. (PA 32; Tr. White 56:6–24). White approved the purchase transaction, knowing it was a bribe, because "[Hayes] was the president of the Gary city council and because [White] wanted to insure that Hayes would not take any action in the city council that would be detrimental to Mid–American Waste Systems of Indiana, Inc." (PA 32 at ¶ 9(b)). White's act of bribery committed through Mid–American Indiana was a criminal act in violation of Title 18, United States Code, Section 666(a)(2) and Title 18, United States Code, Section 2. *Id.* Mid–American Indiana was also charged in connection with the Hayes Bribe for committing a criminal act in violation of Title 18, United States Code, Section 666(a)(2). (PA 44).

Relevant events leading up to the plea agreements include the following. A criminal investigation of White and Mid–American with respect to bribery of a public official in Gary, Indiana (the "Bribery Investigation") began some time in 1991 and, with regard to Mid–American, lasted at least until March 26, 1997 when Mid–American Indiana was fined pursuant to its April 29, 1996 Petition to Enter a Plea.[8] (Tr. White 63:24–64:4; PA 43; PA 44).

During the course of the Bribery Investigation, Mid–American paid legal fees for

---

ment the maximum estimated recovery for Class 4–C claims is 60%. The estimated aggregate amount of Class 4–C claims is $37,500,000. Thus, the Class 4–C claims are subjected to a deficiency of approximately $15,000,000, a sum significantly exceeding White's original request for $5,863,115.26 and vastly exceeding $884,500, the amount White requested at the beginning of the trial, and $430,500, the amount which I find (as discussed hereinafter) represents the maximum for which his claim could be allowed.

**8.** During the course of the Bribery Investigation, Mid–American and its employees also came under scrutiny for making illegal campaign contributions ("Campaign Contribution Investigation"). (Tr. Meredith 172:22–174:17, 227:7–228:7, 249:21–251:19; PA 39, 40, 41). The "Gary Investigation" referenced by the members of the Board of Directors includes both the Bribery Investigation and the Campaign Contribution Investigation. *Id.* However, only the repercussions of the Hayes Bribe to which White and Mid–American Indiana pleaded guilty and the related Bribery Investigation will be considered in this opinion as bearing upon the equitable subordination issue.

White's references to the "Gary Investigation" appear to be limited to just the Bribery Investigation. (Tr. White 26:18–27:10,28:1–,10; White 8 at ¶ B).

its employees involved in the investigation as well as its own legal defense fees. (Tr. Meredith 117:4–16, 225:23–226:4, 226:24–228:27; White 22:20–23:13). Mid–American paid White's personal legal expenses related to the Bribery Investigation until February 6, 1996. (Tr. White 26:18–27:10, 28:1–14, 32:20–33:24, 38:4–9, 40:18–41:1). The December 13, 1994 Audit Committee minutes reflect that the Audit Committee voted pursuant to Article IX(F) of the Mid–American Certificate of Incorporation to advance legal costs related to the defense of certain criminal actions for certain officers and directors of Mid–American, including White, in connection with the Bribery Investigation. (White 8 at 2, ¶ B and at 3; Tr. White 27:15–28:10).

The legal costs associated with the Gary Investigation were clearly substantial. Meredith testified that in 1995 he believed that $500,000 in legal fees were paid to the firm of Latham & Watkins alone in connection with representing Mid–American in the Gary Investigation which he understood to include both the Bribery Investigation and the Campaign Contribution Investigation. (Tr. Meredith 225:23–228:7). This amount did not include the payment of legal fees for other employees or White. *Id.* The legal fees billed to Mid–American between February 6, 1996 and April 12, 1996 for White's defense costs were approximately $62,000. (Tr. White 26:18–27:5, 38:4–14). In the Employment Claim, White is seeking reimbursement of $204,099 for legal fees paid to the firm of Jenner and Block for their work in defending him on the bribery charges from March 1996 through February 1997. (Tr. White 26:18–27:5, 47:10–48:2).

The Gary Investigation also increased Mid–American's operating costs with respect to directors and officers liability insurance. In February 1996, the Board of Directors instructed Meredith to double the directors and officers liability insurance to $10 million. (Tr. Brown 142:11–13; Meredith 223:1–225:10; PA 26 at 1). Due to the Gary Investigation, which the insurance carrier was aware of, Mid–American could only obtain a renewal of its policy for the same $5 million dollar coverage but the premium increased from $150,000 to $305,000. (Tr. Meredith 230:14–234:18; Brown 145:5–8; PA 27 at 1).

*Employment Agreement*

White's Employment Agreement was entered into with Mid–American on March 3, 1993. It is for a period of four years. (White 3; Tr. White 11:3–24). Under the Employment Agreement, White was to "serve as the Chief Executive Officer and President of the Corporation and perform the functions typically associated with such office" as well as "perform such other managerial, administrative, technical and other services as may be designated from time to time by the Board of Directors of the Corporation." (White 3 at § 1; Tr. White 12:13–19).

Section 2 of the Employment Agreement set White's annual compensation at $425,000 per year. (White 3 at § 2). This section also provided that White's salary was to be reviewed and could be increased or decreased by the Compensation Committee of the Board of Directors. *Id.* No evidence was entered that the Compensation Committee ever took the requisite action to reduce this compensation. Section 2 also provides for "such annual bonus, if any, as may be determined by the Compensation Committee of the Board of Directors." *Id.* No evidence was offered to indicate that the Compensation Committee took any such action with regard to a 1995 bonus for White.

Section 3 of the Employment Agreement provides for certain designated fringe benefits as well as "such other fringe benefits as the Corporation's Board of Directors

may deem appropriate, including not less than $1,000,000 of life insurance coverage." *Id.* at § 3.

Section 6 of the Employment Agreement lists the reasons for which the agreement may be terminated, including "for cause" in § 6(b). *Id.* at § 6(b). This section also provides the requisite notice procedure for a termination for cause. *Id.* at § 6(c). No evidence was entered that the Employment Agreement was ever terminated for cause or any other reason prior to its expiration date in March 1997.

*Leave of Absence*

By late 1995 or early 1996 the Bribery Investigation had reached a point where the outside directors (i.e.: directors not employed by Mid–American) (the "Outside Directors") approached the full board and asked to meet separately with Mid–American's counsel, John Lynch ("Lynch") of Latham & Watkins, to discuss the legal issues related to the criminal investigations. (Tr. White 39:7–20; Meredith 178:22–179:12; Garcia 425:21–427:13; Puricelli 467:4–468:5). The Board of Directors agreed. *Id.*

The Outside Directors began to gather information concerning the Bribery Investigation beginning in early 1996 as indicated in the minutes of the January 11, 1996 Board of Directors Meeting. (PA 21). The Outside Director's attorney, Lynch, reviewed the allegations against White and Mid–American and the status of the Bribery Investigation based on his meeting with an assistant U.S. Attorney. (PA 21; Tr. Meredith 172:22–174:2). This first meeting raised the anxiety level of the Outside Directors. (Tr. Meredith 176:1–6). Minutes of a February 1, 1996 meeting reflect further reports to the Outside Directors from counsel regarding the Gary Investigation and the results of Lynch's meeting with the federal prosecutor. (PA 22; Tr. Troja 356:22–357:20; Brown 136:23–137:7; Meredith 180:10–182:13). That update included information that the federal prosecutor would recommend an indictment of White and Mid–American with respect to the Hayes Bribe. (PA 22).

By the end of 1995 or early 1996, Mid–American was experiencing financial difficulties. (Tr. White 82:19–23; Brown 139:20–24, 154:13–155:22; Puricelli 460:5–12; 463:18–464:13; Troja 358:11–359:12). The Outside Directors learned at the February 1, 1996 meeting that the company had been meeting with bankruptcy counsel. (PA 22; Tr. Brown 137:18–138:3; Meredith 184:12–186:6; White 96:15–23,-97:14). In 1995, the company recorded a net operating loss of approximately $180 million. (Disclosure Statement With Respect to Joint Liquidating Plan of Reorganization Of Mid–American Waste Systems, Inc. And Subsidiaries at 6) (Doc. 389).

The Outside Directors were concerned that the criminal investigation was having a negative effect on Mid–American's relationship with its lenders, the negotiations related to extending short-term financing and closing other transactions. (PA 22; Tr. Meredith 182:14–183:23, 185:20–186:6; Troja 357:22–359:24; Puricelli 460:13–17, 477:6–478:2; Garcia 430:13–431:7). The Outside Directors perceived Mid–American's relationship with its lenders at that time as delicate because of the company's financial situation and performance. *Id.* The February 1, 1996 Outside Directors minutes reflect that there was a discussion regarding the importance of full disclosure to senior lenders with regard to the status of the Bribery Investigation. (PA 22 at 2). Given their understanding of the allegations, the status of the Gary Investigation and their belief that White's departure would resolve some of the difficulties with lenders, the Outside Directors determined that it would benefit the company if White took a leave of absence. (Tr. Meredith

194:16–195:16, 197:20–198:11; Garcia 434:16–435:6). At the February 4, 1996 Outside Director meeting, the Outside Directors requested that Brown, an Outside Director and Chair of the Compensation Committee, ask White if he would be willing to take an indefinite leave of absence from Mid–American. (PA 23; Tr. Brown 121:1–8). Brown subsequently met with White on February 6, 1996 and they discussed the leave of absence issue (the "Brown/White Meeting").[9] (Tr. Brown 122:11–123:5).

Immediately after the Brown/White meeting, the full Board of Directors of Mid–American granted White a leave of absence after Brown reported back to them. (PA 24; Tr. Brown 141:14–20). This was not a termination of employment as it was anticipated that White could return to operate the company if he was not indicted. (Tr. Troja 376:13–20; Puricelli 474:13–21, 486:10–22; 503:2–9). The Mid–American Board of Directors issued a press release on February 6, 1996 notifying the public of White's leave of absence and Meredith's appointment to the positions of CEO, President and Chairman of the Board for Mid–American. (PA 25; Tr. White 25:9–12). White performed no duties as President and CEO after February 6, 1996. (Tr. White 60:23–61:6).

At the February 28, 1996 Outside Directors meeting, the Mid–American Compensation Committee recommended that the Board of Directors ask White to resign from the company both as an officer and as a director. (PA 27 at ¶ 2; Tr. Brown 145:9–21; Meredith 234:19–236:10). The

Board of Directors believed this was in the best interest of the company since White's presence, as a target of investigation, was creating difficulty for the company with permitting, creditors and other facets of its operations. (Tr. Meredith 235:23–236:10; Puricelli 492:3–493:11). They also believed that White's departure from Mid–American would be a mitigating factor that would reduce the negative effect of "bad-boy" statutes on Mid–American's operations.

In the waste management industry, "bad-boys" statutes are regulations and/or statutes that permit government regulatory bodies to sanction or refuse to license companies with criminal records. The Outside Directors were aware of these statutes and their implications for Mid–American. (Tr. Meredith 244:1–12; Troja 378:19–379:19; Garcia 443:12–444:19; Puricelli 493:12–495:12). White also was aware of these statutes. (Tr. White 22:14–16; 103:18–104:3; 104:19–105:6). Companies that found themselves in such a situation, as did Mid–American in 1996, could take rehabilitative steps that could mitigate such sanctions. (PA 27 at 2; Tr. White 106:2–17).

The success of companies in the highly regulated waste disposal industry depend to some degree on the reputation of the leadership of those companies. (Tr. White 62:14–63:10). White admitted that the reputation of Mid–American would suffer harm from his own plea of guilty to the bribery charge. (Tr. White 63:6–10). In his testimony, Meredith, who had exten-

9. Early in these proceedings and at the commencement of the trial, White took the position that the Brown/White Meeting resulted in an agreement (the "Oral Agreement") whereby Mid–American agreed to White's entitlement under the Employment Agreement to salary and other benefits. There was no credible evidence offered at trial to support this Oral Agreement and it would appear from White's post trial briefing that he has effectively abandoned the Oral Agreement basis for his claim. In any event, for the reasons discussed hereinafter I find that the alleged Oral Agreement serves no basis for White's Employment Claim.

sive experience in the waste disposal industry, stated that the resignation of White would further enhance the ability of the company to demonstrate that it had undertaken rehabilitative steps that would satisfy the regulatory authorities in the states in which Mid–American operated. (Tr. Meredith 243:19–246:1). Other directors also believed that this would be a mitigating factor. (Tr. Troja 379:8–19; Puricelli 494:9–495:12).

The Board of Directors hoped to negotiate the resignation of White from his positions with Mid–American without having to dismiss him for cause. (Tr. Meredith 239:16–240:3). The Outside Directors were aware that removing White from his position as a director would not be an easy matter. (PA 27). The February 28, 1996 minutes reflect that the Outside Directors were aware that removal of a director must be either voluntarily taken by the director in question or effected by shareholder action. *Id.*

The Compensation Committee in its report at the February 29, 1996 meeting, recommended that a severance package be given to White in which he would receive 30 percent of his existing salary and health benefits. (PA 27 at ¶ 2; Tr. Brown 145:9–21). The severance package was offered to White and he rejected it. (Tr. Meredith 241:14–242:15).

In March 1996, the Mid–American Board of Directors determined that it would enter into a plea agreement with the federal prosecutor with regard to the Bribery Charges and pay the associated fine. (PA 28 at 1–2). On March 13, 1996, the Board of Directors resolved to have Mid–American Indiana plead no contest to a felony charge related to the bribery of the Gary, Indiana public official. (PA 28 at 1). At their February 29, 1996 meeting, the Board of Directors decided to enter into the plea agreements, in part, because they were advised by counsel that such actions would be in the best interests of the company with respect to Mid–American's ongoing operations by possibly mitigating the effect of "bad boy" statutes. (PA 27 at 2; Tr. Troja 374:6–23; Puricelli 489:13–490:8). White voted against the entry of the plea. (PA 28 at 1); (Tr. Troja 382:16–18).

*Resignation Agreement*

On April 12, 1996, an agreement was reached between White and Mid–American for the resignation of White from his positions as an officer and a director of Mid–American ("Resignation Agreement"). (White 4); (Tr. White 35:10–15; Meredith 264:5–24). White understood this agreement to be an exchange whereby his rights under the Employment Agreement were preserved in exchange for his resignation from the Board of Directors. (Tr. White 66:10–19). White testified that he would not have resigned his position as a director of Mid–American unless his rights under the Employment Agreement were preserved. (Tr. White 36:20–37:3). White was financially motivated in this decision. (Tr. White 37:12–18).

Under the Resignation Agreement, White agreed to resign from the Board of Directors and the employ of Mid–American in exchange for Mid–American paying the invoices previously received from Jenner and Block for legal services on behalf of White totaling approximately $62,000. (White 4 at ¶¶ 1 & 2). In the Resignation Agreement White reserved "any and all rights he has to seek reimbursement from Mid–American Waste Systems, Inc. for legal expenses, salary and other benefits, if any, as if he had not resigned from the Company." (White 4 at ¶ 4). White understood this provision to mean that he would have to engage in litigation to determine those rights and obtain any amounts due to him. (Tr. White 71:6–13, 36:5–9). The Resignation Agreement also provided

that "[p]ursuant to the undertaking and Delaware law," Mid–American reserved "any and all rights it has to seek reimbursement from Chris White with regard to fees, expenses and other costs advanced in the event there is an adverse finding in the Indiana criminal proceedings." (White 4 at ¶ 3). White understood this to mean that the Mid–American had the right to seek reimbursement for legal fees expended by the company on his behalf if he were found guilty of conduct that harmed the company. (Tr. White 67:19–68:23). Pursuant to the Resignation Agreement, on April 12, 1996, White submitted his resignation, as an employee, officer and a director of Mid–American. (White 5; Tr. White 35:16–18).

*White's Indictment and Guilty Plea to Hayes Bribery*

White was initially indicted for bribery by the federal government on April 12, 1996, the same day that he resigned. (Tr. White 51:18–52:9). The charges against White were expanded in a second superceding indictment dated September 20, 1996, to include authorizing illegal campaign contributions (PA 19 at 19–20) and taking a kickback from a contractor (PA 19 at 20). On September 19, 1997, White entered a plea agreement to the bribery charge contained in count six of the second superceding indictment. (PA 32).

*Bankruptcy Petition and Employment Claim*

On January 21, 1997, Mid–American and its thirty-one subsidiaries filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Although Mid–American Indiana had entered the plea agreement for bribery charges on April 25, 1996, the fine of $150,200 were not entered until

March 26, 1997. (PA 43 & 44). Mid–American paid the $150,200 fine. (Tr. Meredith 253:10–254:5).

White filed the Employment Claim as a non-priority, unsecured claim for the payment of salary and other benefits relating to his employment by Mid–American. (White 1). The amount of the Employment Claim was asserted to be $5,863,115.26.[10] (White 2 at 7).

On September 17, 1997, this Court entered an order (Doc. 544) confirming the Plan (Doc. 541) and appointing Hobart G. Truesdell as the Plan Administrator. On July 1, 1999, the Plan Administrator filed a Motion for Summary Judgment in Support of the Plan Administrator's Objection to White's Employment Claim ("Summary Judgment Motion"). (Doc. 1023, original entry Doc. 1021.) This Court entered an opinion and an order dated January 3, 2001 (Doc. 1099, original entry Doc. 1097) (the "January 3, 2001 Ruling") regarding the Summary Judgement Motion, in which I held, *inter alia,* that (1) there was no "change of control" as that provision is defined in the Employment Agreement and thus White was not entitled to any "golden parachute" benefits; (2) the Employment Claim was subject to § 502(b)(7) which limited the allowable amount of the claim to one year of compensation and benefits, and (3) White's claim for reimbursement of attorney's fees also fell within the § 502(b)(7) one year limitation since White had failed to demonstrate that such reimbursement was supported by any basis outside the Employment Agreement. Additionally, I found that the Employment Claim properly includes one year's worth of attorneys' fees *provided* that White can demonstrate that his entitlement to such

---

**10.** The claim was comprised of two parts: (1) $1,188,538.42 in unpaid salary, benefits and legal fees for the period of February 1996 through March 2, 1997 (White 2 at 4–5); and

(2) $4,674,576.84 in damages under a change of control provision in section 8 of the Employment Agreement.

fees arose under the Employment Agreement. *See In re Mid–American Waste Systems, Inc., et al.,* 274 B.R. 111, 115–117 (Bankr.D.Del.2001).

In the Joint Pre–Trial Order, pursuant to the one year cap ruling in the January 3, 2001 Ruling, White asserted $942,548 plus interest as the allowable amount of the Employment Claim. (Doc. 1128 at 40, § VIII). At trial, White further amended the amount of Employment Claim by asserting a reduced claim of $884,500 plus interest. (Tr. White 42–48).

### DISCUSSION

The Plan Administrator has responded to the Employment Claims with several challenges to its validity and asserts that the allowed portion of the Employment Claim, if any, is subject to equitable subordination under § 510(c). Based on the findings made at the conclusion of White's case in chief (Tr. 124:13–130:10) and some additional findings detailed in the discussion below, I find that if allowed, the maximum amount of the Employment Claim would be $430,500, which amount is subject to a reduction of $62,000 for the reimbursement or disgorgement of fees paid by Mid–American to the law firm of Jenner &

Block on behalf of White. As discussed in detail below, I conclude that the Employment claim should be subordinated to other general pre-petition claims in this case. Based on the Plan and the Disclosure Statement, such subordination clearly shows that there will be no pay-out on any allowed portion of the Employment Claim even if it were allowed in the $884,500 amount requested.[11] As discussed below, a finding with regard to equitable subordination can be made prior to a determination as to allowance of a claim. I first review and reaffirm my findings regarding the maximum value of the Employment Claim and then discuss my ruling related to equitable subordination.

### MAXIMUM VALUE OF THE EMPLOYMENT CLAIM

At trial, White testified that he was seeking compensation, benefits and reimbursement of legal expenses totaling $884,599 for a one year period which commenced on February 6, 1996. The Employment Claim of $884,599 is comprised of the following five categories (Tr. White 41:21–48:14) (1) unpaid salary of $417,000;[12] (2) fringe benefits of $13,500;[13] (3) an annual bonus for 1995 of $250,000 (Tr.

---

11. See note 7, supra.

12. Represents annual base salary of $425,000 less $8,000 check for one week's salary received in February or March of 1996. (Tr. White 42:1–6).

13. The fringe benefit total of $13,500 includes life insurance premiums of $2,500; COBRA Health Insurance Premiums of $6,000 representing payment of $500 a month for 12 months; and replacement of company car for 10 months at a cost of $5,000. (Tr. White 42:7–44:2,46:12–47:2). White was allowed to keep the company car for two months of the year in question. (Tr. White 46:21–23).
White asserts that he is entitled to $14,500 in fringe benefits. (White Opening Br. at 3). This is no doubt based on the Court's observation that the $63,538 claim for fringe benefits

asserted in the Joint Pre-trial Order was reduced by $49,038 in vacation pay that is subsumed in the compensation claim. (Tr. 124:23–125:8). However, upon reviewing the testimony, I find that White only provided testimony as to claims totaling $13,500 in fringe benefits as detailed above. The $1,000 difference seems to be a reduction in the claim for replacement of the company car from $6,000 (twelve months of payments at $500/ month) to $5,000 (10 months of payment at $500/ month). (White 2; White Reply Br. at 5; Joint Pre–Trial Order at 40, § VIII.8.b; Tr. White 42:7–44:2) (stating White was not seeking fringe benefits in addition to health insurance, life insurance and car replacement and proceeding to discussion of bonus).

White 44:2–23); (4) reimbursement of attorneys' fees from the law firm of Jenner and Block totaling $204,099 (Tr. White 47:13–48:9); (Joint Pre–Trial Order at 40, § VIII.8(d)); and (5) interest on the claim as allowable under the law. (Joint Pre–Trial Order at 40, § VIII.8(a)-(e)); (White 2 at 4–5). White bases his Employment Claim on (1) the Employment Agreement and Mid–American's purported breach of that agreement by failing to pay compensation and benefits provided for in that agreement; (2) the purported Oral. Agreement with Brown, a member of the Mid–American Board of Directors, regarding continuation of White's pay and benefits, including payment of legal fees, during his leave of absence (Tr. White 21:1–16); (3) the Resignation Agreement between White and Mid–American which purportedly preserved White's rights under his Employment Agreement despite his resignation (White 4); (4) Mid–American's Certificate of Incorporation (White 7); and (5) The Audit Committee minutes of December 13, 1994. (White 8).[14]

A claimant filing a proof of claim must allege facts sufficient to support a legal basis for the claim. If the assertions in the filed claim meet this standard of sufficiency, the claim is prima facie valid pursuant to Fed. R. Bankr.P. 3001(f). *In re International Wireless Comm. Holdings, Inc.*, 257 B.R. 739, 742 (Bankr.D.Del. 2001). If an objection is filed, the objecting party bears the initial burden of presenting sufficient evidence to overcome the presumed validity and amount of the claim.

*Id.* Where the objecting party presents substantial evidence to overcome the prima facie validity of the claim, the burden shifts to the claimant to prove his claim by a preponderance of the evidence. *Id.*

The Court found at the outset of the hearing that the Resignation Agreement represented the new deal between the parties. (Tr. 2:16–22). Therefore, the Court finds it unnecessary to determine the existence or content of the purported Oral Agreement since the Resignation Agreement superceded any such agreement. Section 4 of the Resignation Agreement preserved any and all of White's rights "...to seek reimbursement from Mid–American Waste Systems, Inc. for legal expenses, salary and other benefits, if any, as if he had not resigned from the Company." (White 4 at § 4).

As a preliminary matter, the Court notes that the Employment Claim is limited to the amount that White can demonstrate that he was entitled to under the Employment Agreement as it may have been preserved by § 4 of the Resignation Agreement.[15] Additionally, the maximum amount of the Employment Claim is limited to one year of salary and benefits pursuant to § 502(b)(7). (Doc. 1099). The January 3, 2001 Ruling provided that the attorneys' fees White incurred for that one year period were also properly included in the Employment Claim provided that White's entitlement to reimbursement for these fees arose from the Employment Agreement.[16]

---

14. The Employment Claim was filed with copies of (i) the Employment Agreement (White 3), (ii) the Resignation Agreement (White 4), and (iii) a resignation letter dated April 12, 1996 from White to Mid–American (White 5). The Certificate of Incorporation and Audit Committee Minutes were provided at trial. (White 7 & 8).

15. This is in accordance with the January 3, 2001 Ruling (Doc. 1099, original entry Doc. 1097).

16. The January 3, 2001 Ruling found that White had failed to allege facts sufficient to find that any basis other than the Employment Agreement existed to support his entitlement to reimbursement of legal fees and

At the conclusion of White's case in chief, the Court found that based on the testimony and evidence presented, White had at best stated a claim for $431,500 [17] which was subject to reduction to $369,500 by the reimbursement or disgorgement of the $62,000 in improperly authorized legal fees paid by Mid–American to Jenner & Block on behalf of White under the terms of the Resignation Agreement. (Tr. 124:13–130:10). After reviewing the record of the hearing, the Court has determined that its ruling at trial should be modified in one respect. The Court finds that the maximum value of White's claim should be lowered to $430,500 from $431,500.[18]

Therefore, the Court finds that: (1) the maximum value of the claim for compensation is $417,000; (2) the maximum value of the claim for fringe benefits is $13,500; (3) the portion of the claim for a 1995 bonus of $250,000 is disallowed as unsubstantiated; (4) the portion of the claim related to reimbursement of attorney's fees is disallowed [19] and since the payment of these fees was not properly authorized, the $62,000 in fees paid to Jenner & Block under the Resignation Agreement is subject to disgorgement or reimbursement; (5) the Employment Claim is not eligible for pre-judgment interest after the petition date since it is an unsecured prepetition claim. (Tr. 124:13–130:10).

In his post trial briefing, White asks the Court to reconsider its finding that the legal fees advanced by Mid–American, including the $62,000 paid by Mid–American pursuant to the Resignation Agreement, were not authorized by the Board of Directors and therefore Mid–American has the right to seek reimbursement of such payment. White argues that the board's authorization to reimburse officers and directors for past legal fees or to make the

---

granted summary judgment to the Plan Administrator on that issue. (Doc. 1099).

17. This amount represented $417,000 in compensation and $14,500 in fringe benefits.

18. This represents a reduction in the maximum allowable amount of fringe benefits from $14,500 to $13,500 as discussed in note 13, supra.

19. At trial, the Court found that any reimbursement for legal fees incurred by White in defending against actions taken while White was an officer or director of the company is governed by the Certificate of Incorporation, not by any provision in the Employment Agreement. (Tr. 126:9–18). Therefore, based on the January 3, 2001 Ruling, White may not assert the Certificate of Incorporation as a basis of the Employment Claim since that decision limited his assertion to a claim for reimbursement of legal fees to rights arising under the Employment Agreement.

White asserts that § 3 of the Employment Agreement granted White the right to any fringe benefits that had been approved by the Compensation Committee of the Board of Directors. White offered the December 14th Audit Committee minutes to show that such a benefit had been granted and the Certificate of Incorporation to show that authority to approve such expenses existed. Even if this Court were to overlook the fact that the right to indemnification of legal fees for officers and directors emanates from the Certificate of Incorporation rather than the Employment Agreement, White still has not proven that he is entitled to such reimbursement. The Employment Agreement references the Company's Board of Directors not the Audit Committee as the source of authority for granting additional fringe benefits to officers and directors under the Employment Agreement. Therefore, even if the Court were to consider the Audit Committee's action to be valid under the Certificate of Incorporation, it did not create a fringe benefit under § 3 of the Employment Agreement and thus did not establish a fringe benefit arising from the Employment Agreement as required by the January 3, 2001 Ruling. White did not produce any evidence that the Board of Director's had delegated its authority to establish fringe benefits under the Employment Agreement to the Audit Committee.

$62,000 payment was never identified prior to trial as a disputed issue and therefore he was denied an adequate opportunity to prepare to address that issue at trial. *Id.* at 11 & 12. Additionally, White argues that Mid–American has characterized the $62,000 payment as consideration given by Mid–American for the resignation agreement and Mid–American's witnesses testified that the company's counsel, Lynch, was authorized to enter into the Resignation Agreement with White. The Plan Administrator responds that White was not prejudiced by the Court's finding on this issue since it was White who introduced the Certificate of Incorporation for the express purpose of demonstrating that he was entitled to reimbursement of attorney's fees. *See* PA Answering Br. at 37. I agree. The finding was made at the end of White's case in chief based on evidence presented by White in support of his assertion that he was entitled to reimbursement of attorney's fees. The evidence relevant to the Court's decision was ¶ 3 of the Resignation Agreement (White 4), White's guilty plea in connection with the Hayes Bribery for which past attorney's fees, including the $62,000, had been paid by Mid–American; the Certificate of Incorporation (White 7) and the December 14, 1994 Audit Committee minutes (White 8). White asserted that this evidence and the company's past payments of his legal fees demonstrated his entitlement to such reimbursements. However, White also testified that was aware that he could be required to reimburse Mid–American if he was found guilty of harming the company. (Tr. White 67:19–68:23). White asked the Court to draw a conclusion regarding his entitlement to reimbursement for legal fees based on this evidence. The Court did so.

The Plan Administrator has objected to the Employment Claim and asserts that White is not entitled to the claimed salary and benefits because: (1) White breached his Employment Agreement by failing to perform the functions of CEO and President of Mid–American after February 6, 1996; (2) the Court should treat White's Employment Agreement as if it were terminated since White could have been terminated for cause; (3) any Oral Agreement regarding continued payment of salary and benefits fails under the statute of frauds both as an oral agreement that could not be performed in one year and as too indefinite to be enforced since the salary was undetermined; (4) the Resignation Agreement is void under a fraudulent inducement theory since White knew he was guilty of a crime when he entered into the agreement but failed to disclose his guilt to Mid–American; (5) any claim under the Employment Agreement must fail since White breached his Employment Agreement by violating his fiduciary duties; and (6) the Resignation Agreement is unenforceable under the statute of frauds for indefiniteness since White admits that he understood that his salary might be reduced during his leave of absence since Meredith would replace him as CEO.

The Court enters no findings as to these arguments other than to note that (1) the argument regarding indefiniteness of the salary amount pursuant to the Employment Agreement is mooted by the Court's finding that Mid–American never took the requisite action to reduce the salary pursuant to § 2 of the Employment Agreement; (2) the argument that the Employment Agreement could have been terminated for cause was rejected by the Court at trial (Tr. 2:6–22); and (3) since the Resignation Agreement represented the new deal between the parties, any arguments related to the Oral Agreement and the voluntary or involuntary nature of the leave of absence are moot.

## EQUITABLE SUBORDINATION

The Plan Administrator argues that equitable subordination is appropriate under two theories: (1) that White engaged in inequitable conduct that harmed Mid-American or its creditors and (2) that the equities of this case support equitable subordination even in the absence of inequitable conduct. I find that White engaged in inequitable conduct. Therefore I need not address the Plan Administrator's argument that under Third Circuit law courts need not find inequitable conduct in all cases in order to invoke equitable subordination under § 510(c).[20]

*Legal Standard*

■ For purposes of distribution, Section 510(c)[21] permits a bankruptcy court to subordinate an allowed claim, on equitable grounds, to the claims of other creditors of a debtor's estate. "In the exercise of its equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate." *Burden,* 917 F.2d 115, 117 (3d Cir.1990) (quoting *Pepper v. Litton,* 308 U.S. 295, 307–08, 60 S.Ct. 238, 245–46, 84 L.Ed. 281 (1939)). The essential purpose of equitable subordination is to undo any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of distribution of the estate. *See id.* at 117 (citing *Trone v. Smith (In re Westgate-California Corp.),* 642 F.2d 1174, 1177 (9th Cir.1981)); *Westgate,* 642 F.2d at 1177 ("Bankruptcy courts are empowered to subordinate claims where subordination will promote a just and equitable distribution of the bankrupt estate."); *Diazo Serv. Co., Inc. v. Redmond (In re Diazo Serv. Co., Inc.),* 144 B.R. 771, 776 (Bankr. M.D.Tenn.1992).

■ Although § 510(c) deals with allowed claims, a determination as to whether a claim is subject to equitable subordination under § 510(c) may be made before the determination as to the allowance of the claim. *United States Abatement Corp. v. Mobile Exploration & Producing U.S., Inc. (In the Matter of United States Abatement Corp.),* 39 F.3d 556, 560 (5th Cir. 1994) (finding no requirement that a bankruptcy court address the merits of a pending claim prior to disposing of a motion for equitable subordination). Equitable subordination is not a defense to a debtor's liability on a claim. *See In re County of Orange,* 219 B.R. 543, 559 (Bankr.C.D.Cal. 1997); *Benjamin v. Diamond (In the Matter of Mobile Steel),* 563 F.2d 692, 699 (5th Cir.1977) ("Equitable considerations can justify only the subordination of claims, not their disallowance."). Equitable subordination is a legally distinct proceeding which seeks to re-prioritize the order of allowed claims based on the equities of the case, rather than to allow or disallow the claim in the first instance. *In re County of Orange,* 219 B.R. at 559; *see also Bur-*

---

20. The Plan Administrator cites *Burden v. United States (In re Burden),* 917 F.2d 115, 120 (3d Cir.1990) for this proposition and offers the following cases as examples of its application: *Montgomery Ward Holding Corp. v. Schoeberl (In re Montgomery Ward Holding Corp.),* 272 B.R. 836, 845 (Bankr.D.Del.2001) and *Montgomery Ward Holding Corp. v. McCaffrey (In re Montgomery Ward Holding Corp.),* Adv. Pro. No. A–99–561, 2000 WL 33712303 at *4, 2000 Bankr.Lexis 1690 at *13 (Bankr.D.Del. Dec. 11, 2000).

21. Section 510(c) reads in relevant part:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—
(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest;

*den,* 917 F.2d at 117 (finding that existing priorities among creditors of the debtor may be reordered under principles of equitable subordination).

 Courts generally apply a three-pronged test to determine whether a claim may be equitably subordinated: (1) the claimant must have engaged in some type of inequitable conduct; (2) the claimant's misconduct must have resulted in injury to other creditors *or* conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the Bankruptcy Code. *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims,* 160 F.3d 982, 986–87 (3d Cir.1998); *Century Glove, Inc. v. Iselin (In the Matter of Century Glove, Inc.),* 151 B.R. 327, 333 (Bankr.D.Del.1993). In determining whether these three conditions are satisfied three principles must be kept in mind. *Mobile Steel,* 563 F.2d at 700. First, the inequitable conduct directed against the bankrupt or its creditors may be sufficient to warrant subordination of a claim irrespective of whether it was related to the acquisition or assertion of that claim. *Id.*[22] Second, a claim or claims should be subordinated only to the extent necessary to offset the harm which the bankrupt and its creditors suffered on account of the inequitable conduct. *Id.* at 701. Finally, a party seeking equitable subordination of a creditor's claim usually has the initial burden of proof. *Id.* at 701–02.

 Although there is an initial presumption of validity that attaches to all claims, claims asserted by insiders or fiduciaries demand closer scrutiny.[23] *Fabricators,* 926 F.2d at 1465; *Mobile Steel,* 563 F.2d at 701–02. The party seeking to subordinate a claim has the burden of coming forward with material evidence to overcome the prima facie validity accorded to proofs of claim. *Fabricators,* 926 F.2d at 1465; *Mobile Steel,* 563 F.2d at 701. Once the proponent of subordination comes forward with material evidence of unfair conduct, the burden shifts to the insider or fiduciary claimant to demonstrate the fairness of his conduct. *Fabricators,* 926 F.2d at 1465; *Mobile Steel,* 563 F.2d at 701; *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims (In re Papercraft),* 211 B.R. 813, 823 (W.D.Pa.1997), *aff'd and remanded for further findings* by *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims,* 160 F.3d 982 (3rd Cir.1998). The burden on the fiduciary is not only to prove the good faith of such a transaction but also to show the inherent fairness from the point of view of the corporation and those with interests therein. *See Papercraft,* 211 B.R. at 823 (citing *Pepper v. Litton,* 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281 (1939)).

*Inequitable Conduct*

 The most important factor in determining if a claimant has engaged in inequitable conduct for the purposes of equitable subordination is whether the claimant was an insider[24] or outsider in relation to the debtor at the time of the act. *See Capitol Bank & Trust Co. v. 604*

---

**22.** *See also Fabricators, Inc. v. Technical Fabricators, Inc. (In the Matter of Fabricators, Inc.),* 926 F.2d 1458, 1467, n. 14 (5th Cir. 1991).

**23.** Fed. R. Bankr.P. 3001(f) creates a presumption in favor of validity of a claimant's proof of claim.

**24.** Under § 101(31) an "insider" includes:

(B) if the debtor is a corporation—
 (i) director of the debtor;
 (ii) officer of the debtor;

70

Columbus Ave. Realty Trust (In re 604 Columbus Ave. Realty Trust), 968 F.2d 1332, 1360 (1st Cir.1992); Fabricators, 926 F.2d at 1465. For non-insider claimants, egregious conduct must be established to justify equitable subordination. See Friedman v. Sheila Plotsky Brokers, Inc. (In re Friedman), 126 B.R. 63, 71 (9th Cir. BAP 1991) (finding that for non-insider claimants, the objecting party must prove that the claimant is guilty of gross misconduct tantamount to fraud, overreaching or spoilation to the detriment of others); Century Glove, 151 B.R. at 333; In re Future Energy Corp., 83 B.R. 470, 483 (Bankr.S.D.Ohio 1988) (finding that for non-insider and non-fiduciary claimants, the standard of proof is egregious conduct such as fraud, spoilation or overreaching). However, where the claimant is an insider, the standard for finding inequitable conduct is much lower. See Fabricators, 926 F.2d at 1465; Century Glove, 151 B.R. at 333; Future Energy, 83 B.R. at 483 (finding that the standard of proof for insider and fiduciary claimants is material evidence of unfair conduct). Courts have generally recognized three categories of misconduct which may constitute inequitable conduct for insiders: (1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego. Summit Coffee Co. v. Herby's Foods, Inc. (In the Matter of Herby's Foods, Inc.), 2 F.3d 128, 131 (5th Cir. 1993); Fabricators, 926 F.2d at 1467; Roberts v. Geremia (In re Roberts, Inc.), 15 B.R. 584, 586 (Bankr.D.R.I.1981) (holding that the claimant's criminal activities constituted inequitable conduct justifying equitable subordination). The status of the claimant as an insider or fiduciary only goes to the standard of review. To qualify as inequitable conduct, the insider or fiduciary creditor must have actually used its power to control the debtor or its position

of trust with the debtor to its own advantage or to the other creditors' detriment. Citicorp, 160 F.3d at 987 (finding that using non-public information obtained by means of fiduciary position as director to exploit a corporate opportunity without disclosing actions to board or selling note holders constituted inequitable conduct by a fiduciary); Fabricators, 926 F.2d at 1467; Roberts, 15 B.R. at 586 ("A bankruptcy court can equitably subordinate a creditor's claim where that creditor has breached a fiduciary duty resulting in detriment to other creditors.").

■ White asserts that in order to have engaged in inequitable conduct, it must be shown that the claimant obtained or sought some personal advantage through his conduct. In support, White offers the cases of Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting, 908 F.2d 1351 (7th Cir.1990) and Capitol Bank & Trust Co. v. 604 Columbus Ave. Realty Trust (In re 604 Columbus Ave. Realty Trust), 968 F.2d 1332 (1st Cir.1992) for the proposition that " 'inequitable conduct' in commercial life means breach plus some advantage-taking". White Opening Brief at 14–15; citing Kham & Nate, 908 F.2d at 1357 and 604 Columbus Ave., 968 F.2d at 1361–62. In his argument, White equates "advantage-taking" with "personal advantage" or "unfair advantage." White argues that the element of advantage-taking required to demonstrate inequitable conduct is clearly lacking in this case since he did not seek to gain some unfair advantage in making the Hayes Bribe, nor did he in fact gain any unfair advantage as a result of the bribe. I disagree with White's analysis of the law on this issue. First, as the second prong of the equitable subordination test demonstrates, a claimant need not have engaged in the inequitable conduct for personal benefit. Citicorp, 160 F.3d at 986 (stating the test requires that the

claimant's misconduct must have resulted in injury to other creditors or conferred an unfair advantage on the claimant). Second, the two cases White offers deal with outside creditors who had no fiduciary duty to the debtor. White is both an insider and a fiduciary of Mid–American by virtue of his positions as an officer and a director. He did not have a "commercial" relationship with Mid–American (i.e.: outside creditor with mere contractual relationship with a debtor) as envisioned by these two cases.[25]

*Unfair Advantage To Claimant Or Harm To The Debtor Or Its Creditors*

██ Under the second prong of the traditional equitable subordination analysis, the Court must determine whether the claimant's inequitable conduct either (i) created some unfair advantage for the claimant or (ii) harmed the debtor or its creditors. This standard is stated in the disjunctive so only either unfair advantage *or* harm must be established. See *Citicorp,* 160 F.3d at 986 ("the misconduct must have resulted in injury to the creditors *or* conferred an unfair advantage on the claimant") (emphasis added).

██ This prong of the analysis is satisfied if the party seeking equitable subordination demonstrates that the claimant's conduct has harmed the debtor or its other creditors. See *604 Columbus Ave.,* 968 F.2d at 1363 (noting that equitable subordination is appropriate "when the misconduct results in actual harm to the debtor *or* other creditors") (emphasis added); *In re Westgate,* 642 F.2d at 1177

(finding claimant committed numerous inequitable acts in course of relationship with debtor). Any alleged good faith on the part of the claimant will not negate the harm sustained by the debtor or its creditors. See *Machinery Rental, Inc. v. Herpel (In the Matter of Multiponics, Inc.),* 622 F.2d 709, 720 (5th Cir.1980). However, the creditors that will benefit from the subordination of the claim must be the creditors that were injured by the inequitable conduct. *Citicorp,* 160 F.3d at 991–92 (finding that injury to the note sellers could not form the basis of an equitable subordination that would benefit only non-selling creditors and thus, injury to the non-selling creditors of the debtor must be established to warrant subordination).

██ An injury to the debtor caused by a claimant's inequitable conduct in reasonable proximity to bankruptcy or while the corporation is in financial distress decreases the likelihood of the recovery of claims by general creditors, and thus injures them. See *Mobile Steel,* 563 F.2d at 700 (citing *In re Kansas City Journal–Post Co.,* 144 F.2d 791 (8th Cir.1944)). There is no requirement that the purported misconduct or the harm it causes be a major cause of the debtor's bankruptcy. *604 Columbus Ave.,* 968 F.2d at 1362. "If the misconduct harmed the entire creditor class, it is sufficient to show as harm that general creditors will be less likely to collect their debts as a result of the misconduct." *Liberty Mutual Ins. Co. v. Leroy Holding Co., Inc. (In re Fort Ann Express, Inc.),* 226 B.R. 746, 757 (N.D.N.Y. 1998) (citations omitted); *see also Official Comm. of Unsecured Creditors v. Liberty*

**25.** *Kham & Nate's,* 908 F.2d at 1357–58 (finding that claimant bank was not an insider, that bank had the right to enforce the terms of its contract, and that parties to a contract are not each other's fiduciaries).
*604 Columbus Ave.,* 968 F.2d at 1361–62 (finding that bank was an outsider with contractual rights to withdraw a specified amount of soft costs from debtor's account but that when bank abused its contractual right to withdraw funds in order to withdraw soft costs well in excess of the contractual amount, it had engaged in inequitable conduct).

*Savings Bank (In re Toy King Distribs., Inc.)*, 256 B.R. 1, 201 (Bankr.M.D.Fla. 2000) (finding that elements of harm can be satisfied by showing that general creditors are less likely to collect their debts) (quoting *80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 840 (Bankr.S.D.N.Y.1994) ("If the misconduct results in harm to the entire creditor body, the objecting party need not identify the injured creditors or quantify their injury, but need only show that the creditors were harmed in some general, concrete manner.")); *604 Columbus Ave.*, 968 F.2d at 1362.

■ Equitable subordination is remedial not penal. *Mobile Steel*, 563 F.2d at 701. Therefore, claims should be subordinated only to the extent necessary to offset that harm which the bankrupt and its creditors suffered on account of the inequitable conduct. *Id.; see also Citicorp*, 160 F.3d at 991; *Herby's Foods*, 2 F.3d at 131 (finding subordination proper only to extent necessary to offset the harm the creditors suffered as a result of the inequitable conduct).

■ The appellate court requires findings sufficient to permit a judgment to be made regarding the proportionality of the remedy (amount and level of equitable subordination) to the injury that has been suffered by those who will benefit from the subordination. *Citicorp*, 160 F.3d at 991. Thus it is the bankruptcy court's task in such a case to identify the nature and extent of the injury it intends to compensate and specifically find when those injuries are not fully quantifiable. *Id.* When making a finding as to whether a claimant's inequitable conduct caused harm to the debtor or its creditors, a court need not overlook an injury to those parties merely because such injury is not easily quantified:

[W]e do not suggest that a bankruptcy court can never impose a subordination remedy beyond disgorgement of profit without putting a specific price tag on the loss suffered by those who will benefit from the subordination. Such quantification may not always be feasible and, where that is the case, it should not redound to the benefit of the wrongdoer. A bankruptcy court should, however, attempt to identify the nature and extent of the harm it intends to compensate in a manner that will permit a judgment to be made regarding the proportionality of the remedy to the injury that has been suffered by those who will benefit from the subordination. If that is not possible, the court should specifically so find. *Id.*

■ Therefore, full quantification of harm is not required in every case. Nor does the burden of providing the evidence of the amount of harm always fall fully on the proponent of subordination. Rather, once the proponent establishes that the inequitable conduct caused substantial harm to the debtor or its creditors, the burden shifts to the claimant who engaged in the inequitable conduct to demonstrate that the (i) harm caused was discrete in nature and (ii) the court can determine the amount of harm done without undue complication. *Westgate*, 642 F.2d at 1178 (finding that the court need not engage in extensive litigation to determine the extent of damages caused by claimant's inequitable conduct).[26]

---

26. *See also Columbia Gas and Electric Corp. v. United States*, 153 F.2d 101, 102 (6th Cir.), *cert denied*, 329 U.S. 737, 67 S.Ct. 48, 91 L.Ed. 636 (1946) (holding that equitable subordination is appropriate where claimant's il-

legal or inequitable conduct harmed creditors, even if it is difficult to measure the harm caused); *In the Matter of Automatic Washer Company*, 226 F.Supp. 834, 836 (S.D.Iowa), *aff'd* 338 F.2d 1006 (8th Cir.1964) (subordi-

White has offered alternative standards for this prong of the equitable subordination analysis. First, White asserts that the inequitable conduct must personally benefit the claimant. Clearly, the Third Circuit test for the second prong of the equitable subordination test belies this argument. *See Citicorp*, 160 F.3d at 986. Second, White asserts that the proponent of subordination must demonstrate both harm to the debtor and harm to its creditors or must demonstrate that harm to the debtor also harmed the creditors of the debtor. (White Opening Br. at 15). White offers no case in support of this proposition. The proponent of subordination need only demonstrate that the claimant's inequitable conduct either harmed the debtor *or* harmed other creditors of the debtor. *Diazo*, 144 B.R. at 777–78 (finding that chapter 11 debtor's failure to link inequitable conduct by creditors to any measurable injury **to debtor or its creditors** was fatal to debtor's equitable subordination claim). Finally, White implies that in order to fulfill the requirements of the harm prong, that the proponent of subordination must demonstrate that the injury to the debtor's other creditors was different than the injury suffered by the claimant who is also a creditor of the debtor.[27] This assertion is contrary to the purpose of equitable subordination which is to correct the inequity of allowing a creditor who injured the debtor or its creditors through his inequitable action to participate in the distribution of the diminished estate on par with those creditors. Equitable subordination views the harm and the remedy solely from the eyes of the injured debtor and/or its injured creditors.

It is simply of no consequence that the claimant's recovery was also injured by his own inequitable actions.

### Equitable Subordination Must Be Consistent With The Provisions Of The Bankruptcy Code

Under the third prong of the § 510(c) analysis, this Court must determine whether the subordination of a particular claim is consistent with the Bankruptcy Code. This prong " 'has been read as a 'reminder to the bankruptcy court that although it is a court of equity, it is not free to adjust the legally valid claim of an innocent party who asserts the claim in good faith merely because the court perceives the result is inequitable' ' ". *Citicorp*, 160 F.3d at 990 (quoting *United States v. Noland*, 517 U.S. 535, 539, 116 S.Ct. 1524, 1526, 134 L.Ed.2d 748 (1996)) (citations omitted). This prong is satisfied if subordination "is consistent with the basic goal of equality of distribution in bankruptcy." *Hovis v. Powers Constr. Co., Inc. (In re Hoffman Assocs., Inc.)*, 194 B.R. 943, 966 (Bankr.D.S.C.1995). "A claimant whose inequitable conduct has harmed other creditors has skewed the prospects for equal distribution, and subordination corrects this." *Id.*

### Subordination of the Employment Claim is Appropriate

I find that the three part test for equitable subordination has been met in this case and that equitable subordination of the Employment Claim up to the maximum value of that claim is appropriate.

---

nating claim where the extent of the harm caused by claimant's inequitable conduct was difficult to ascertain).

27. ".. even accepting Mid–American's suggestion that damage to the company somehow by definition indirectly injures creditors, there is no evidence from which to conclude that this theoretical injury to creditors was any different for Mr. White than it was for any other creditor." White Opening Br. at 16.

White's conduct consisting of a criminal act and breaches of fiduciary duties was inequitable. As President and a director of Mid–American, White was an insider and a fiduciary of the corporation. White used these positions of authority, responsibility and trust with the debtor in the commission of his inequitable acts. The record clearly establishes that White affirmatively engaged in illegal activity, namely bribery of a public official, in his role as President and CEO of Mid–American. This criminal conduct exposed Mid–American to (i) criminal prosecution and (ii) the risk of loss of necessary licenses and permits. White admitted that he committed bribery by paying corporate funds to a Gary, Indiana councilman for the purpose of ensuring that the councilman would not take action in the city council that would be detrimental to Mid–American.[28] (PA 32 at ¶ 9(b)). White approved the purchase transaction which camouflaged the bribery in his capacity as President and CEO. Moreover, White admitted that his criminal activities constituted a serious breach of his fiduciary duties to Mid–American and harmed Mid–American's reputation and goodwill when those were important to the company's success in the highly regulated waste disposal industry. (Tr. White 62:14–63:10; Meredith 283:4–284:16).

White also breached his fiduciary duty as a director of the corporation by maintaining his silence as to his guilt for six years, thus allowing the corporation to pay his personal legal fees when as President, CEO and Chairman of the Board of Directors he should have known that he did not meet the requisite standard of conduct to be entitled to indemnification pursuant to the provision of Mid–American's Certificate of Incorporation.

White has asserted that his conduct does not meet the requisite standard for inequitable conduct because he derived no personal benefit from the bribery transaction. White bases this assertion on his interpretation of the finding in *Kham & Nate's* that " 'Inequitable conduct' in commercial life means breach *plus* some advantage-taking...". 908 F.2d at 1357. As discussed above, this argument is without merit.

White's inequitable conduct caused both tangible and intangible harm to the debtor and its creditors. The Plan Administrator put forth evidence of substantial harm to the Debtor and its creditors. Therefore, the burden was on White to demonstrate (i) that the harm was discrete in nature and (ii) the court can determine the amount of the harm done without undue complication. *Westgate*, 642 F.2d at 1178. Where quantification is not feasible, the inability to quantify the full extent of the harm should not redound to White's benefit. *Citicorp*, 160 F.3d at 991. White's assertions that he engaged in the bribery for the benefit of Mid–American and to preserve a substantial corporate investment in the Gary, Indiana landfill do not serve to negate or reduce the harm caused by his inequitable conduct. *Multiponics*, 622 F.2d at 720 (Tr. White 32:6–10). The Plan Administrator and White dispute the type and extent of the harm caused by White's commission of the Hayes Bribery, the ensuing Bribery Investigation and the *nolo contendere* plea of Mid–American.

I find that the tangible, easily quantifiable harm has been established here. First, Mid–American Indiana entered a

---

**28.** I did not find White's testimony alleging that he merely failed to undo the transaction credible. (Tr. 58:21–59:4). That testimony is belied by both his guilty plea, (PA 32 at ¶ 9(b)), the contents of that plea, *Id.*, and his admission that he made a severe mistake by committing the bribery. (Tr. White 62:3–9).

plea of *nolo contendere* to a bribery charge resulting from Mr. White's criminal activity and paid a fine of $150,200. (PA 42, 43 & 44; Tr. Meredith 252:10–254:5). White responds that Mid–American has not explained how this plea and the associated fine caused any cognizable harm to any creditor or affected in any way the payment of any creditor's claim and that indeed this harm is not attributable to him since as a director, he voted against entering into such a plea.[29] Unquestionably, the $150,200 fine resulted from White's inequitable conduct and the payment of that fine during the Debtor's bankruptcy decreased the assets of the estate and thus affected the payout to general creditors.[30] Second, Mid–American paid $62,000 of Mr. White's outstanding legal fees billed by Jenner and Block between February 6, 1996 and April 12, 1996 as part of the Resignation Agreement. White testified that those fees were related to the Bribery Investigation. (Tr. White 22:24–23:9, 26:18–27:5, 28:1–10; White 4). As an officer and director of Mid–American, White was aware or should have been aware, that he was not entitled to indemnification for legal fees connected to the Bribery Investigation pursuant to the provisions of the Mid–American Certificate of Incorporation. By accepting this payment while the company was financially distressed, White gained an unfair advantage over other creditors of Debtor's estate. It must be noted however that these legal fees are subject to be recovered through set-off, reimbursement or disgorgement. To that extent, they arguably may not at the same time be used for the calculation of harm

for the purpose fashioning the remedy of equitable subordination.

However, when determining the extent of the equitable subordination remedy, I need not overlook other harm that resulted from White's inequitable conduct merely because it is not easily quantifiable. The inability to fully quantify the harm caused by White's inequitable conduct should not redound to White's benefit. This Court need only make findings that allow an appellate court to determine the proportionality of the remedy to the harm resulting from the inequitable conduct. Therefore, White's arguments that the Plan Administrator has not offered evidence quantifying other harms is not on point. The Plan Administrator need only establish that harm resulted from White's inequitable conduct and that it was substantial enough to warrant equitable subordination of the Employment Claim.

I find that substantial harm was visited on Mid–American which, although not fully quantifiable, exceeds White's claim. Although White's criminal act took place in 1991, the effects of this inequitable conduct clearly harmed Debtor's business operations and depleted Debtor's estate prior to bankruptcy and in the bankruptcy itself. Once substantial harm meriting equitable subordination is established, it was White's burden to demonstrate that the harm was (i) discrete in nature and (ii) the court could determine the amount of harm done without undue complication. White did not meet this burden. The following harm

---

29. As for White's vote against entering into the plea agreement, given his subsequent admission of guilt regarding the Hayes Bribery, such a vote can only be construed as further evidence of White's self-interest in hiding his criminal conduct and yet another violation of his fiduciary duties to Mid–American.

30. The plea agreement was entered into April 25, 1996, however, the fine of $150,200 was assessed at sentencing on March 26, 1997, which was post-petition. (PA 43 & 44). Unchallenged testimony indicates that the fine was subsequently paid by the company. (Tr. Meredith 253:10–254:5).

has been established but not fully quantified:

(1) Mid–American incurred substantial legal fees in connection with its defense of the Bribery Investigation which began sometime after March 1991 and lasted until March 1997, the payment of Mr. White's legal fees from December 1994 until February 1996, and the payment of legal fees for its other employees, officers and directors during the course of the Bribery Investigation. The Court finds that the cost of these legal fees is well in excess of $218,300. Even if the Court only considers the legal fees expended closer to the bankruptcy, the fees would exceed this amount. Mid–American has offered testimony that in 1995 its costs were $500,000 for its own defense of the Bribery Investigation and the Campaign Contribution Investigation. (Tr. Meredith 227:10–228:7).[31] This figure excludes the cost of law firms hired to defend employees in these matters. *Id.* Mid–American was using the same law firm to defend both matters and the pleas were negotiated with the assistant U.S. Attorney. Thus, it is unlikely that the cost of defending just the Bribery Investigation could be culled from this number even given extensive documentation.

However, I find that the cost of Bribery Investigation in 1995 to be substantial and credible evidence suggests that is was at least $250,000.[32] There is no reason to suggest that the expenses would have been less in 1996 when Mid–American, through Meredith and Garcia, were meeting with the assistant U.S. Attorney and were receiving advice on the plea agreement from counsel. (PA 28; Tr. Garcia 446:1–19). Indeed, the Bribery Investigation cannot be considered complete until Mid–American Indiana's sentencing on March 26, 1997, two months after Mid–American filed for bankruptcy. White cannot dispute that Mid–American paid legal fees for its own defense during the Bribery Investigation, the negotiation of its plea to the resulting charge, or the entry of the plea and he has given no reason for this Court to believe that Mid–American had lower costs than he did for the same time period. Indeed, they must have been higher.[33] Therefore I conclude that over the course of the Bribery Investigation, Mid–American incurred legal expenses well in excess of $218,300 and that even if only the costs incurred in 1996 and 1997 are considered, Mid–American's legal expenses related to the Bribery Investigation are in excess of that amount.

(2) Mid–American was unable to increase its directors & officers liability insurance from $5 million to $10 million and its premium for its then existing cov-

---

**31.** Meredith defined the Gary criminal investigation as including both the bribery issue and illegal campaign contribution issue. (Tr. Meredith 173:13–174:2). Meredith also clearly stated that the legal fees were those associated with both these investigations. (Tr. Meredith 228:2–7).

**32.** White testified that his claim for legal fees in the Employment Claim was based on the Bribery Investigation. (Tr. White 47:10–48:2, 26:18–27:5). For the one year period from March 1996 through February 1997, those fees were $204,000. (White 6). White also accrued legal bills in the amount of $62,000 between February 6, 1996 and April 12, 1996.

This suggests a substantial annual defense cost related to the Bribery Investigation. This Court cannot conceive of any reason why the defense costs for Mid–American would have been any less than those for White.

**33.** White does not dispute the fact that Mid–American paid legal fees for its other officers, directors and employees in connection with its defense to the Bribery Investigation. In fact, White elicited this testimony in support of his contention that he was owed indemnification of his own very substantial legal fees. (Tr. Meredith 117:5–16).

erage of $5 million was increased from $150,000 per year to $305,000 per year. This is logically a result of Mid–American's required disclosure of the Gary Investigation, which included the Bribery Investigation and the Campaign Contribution Investigation, to the insurance carrier. It is not possible to discern what portion of the $155,000 increase is attributable to the criminal investigation and charges in the Bribery Investigation rather than the Campaign Contribution Investigation. Nor has White presented evidence that would assist the Court in determining this or which would show some other plausible explanation for the company's inability to increase its insurance or the doubling of its rate. White's inequitable conduct precipitated the criminal investigation of Mid–American and himself as an officer and director. Therefore, I must conclude that a substantial portion of this increased insurance premium is attributable to his inequitable conduct.

(3) The pending criminal investigation had a negative impact on Mid–American's negotiations with its lenders and thus, made it difficult for Mid–American to obtain more favorable terms with respect to the significant debt that had to be refinanced. (Tr. Meredith 182:14–183:23, 185:20–186:6; Troja 357:22–359:22; Garcia 430:13–431:7; Puricelli 460:13–17, 477:6–478:2). The impact of the Bribery Investigation and the subsequent *nolo contendere* plea by Mid–American's subsidiary on Mid–American's financing costs are not easily measured. However, credible testimony has been entered regarding this element of the harm caused by White's inequitable conduct and it is clear that the Bribery Investigation had an impact on Mid–American's operations, the actions of its directors, and the company's ability to finance its operations and function effec-

tively. Therefore, this harm though not fully quantifiable must be considered.

(4) The criminal investigation also increased Mid–American's costs with respect to its dealings with regulatory agencies. Mid–American established, through Meredith's testimony, that in his personal experience Mid–American experienced increased costs in obtaining a license due to objectors who utilized the criminal investigation and bad boy provisions to delay approval of their permit. (Tr. Meredith 283:4–284:16). White's attempts to recast this testimony are unpersuasive. (White Reply Br. at 13–14). It is clear that the Bribery Investigation and the subsequent *nolo contendere* plea by Mid–American Indiana caused by White's inequitable conduct damaged Mid–American's goodwill and gave Mid–American's opponents a legal reason to oppose Mid–American operations and permitting under the bad boy provisions. (Tr. Meredith 283:4–284:16; White 63:6–10).

(5) The criminal investigation and subsequent *nolo contendere* plea to bribery of a public official in Gary, Indiana made it impossible to recapture the former waste disposal site that was the subject of the bribe. (Tr. Meredith 284:17–286:4). White's inequitable conduct is directly linked to the Gary, Indiana landfill. (PA 32 at ¶ 9(b)). White's own testimony supports the finding that the operation in Gary was valuable to Mid–American. (Tr. White 32:6–10) (testifying that when the bribe was made Mid–American had invested $15 to $18 million in upgrades to the Gary, Indiana landfill). Although it is not possible to ascertain the amount of the loss of future revenues from that operation, it is certain that White's inequitable actions had an impact of Mid–American's ability to do business ever again in Gary, Indiana.

White is not an innocent third party asserting a claim in good faith. Rather,

White, in his capacity as a fiduciary of Mid–American, engaged in a course of criminal conduct that breached his fiduciary duties and caused substantial harm to Mid–American and its creditors. It would be inequitable to allow White to share equally in the distribution of the estate with the very creditors he harmed by his criminal conduct and breaches of fiduciary duties.

White's arguments that this prong has not been met are unpersuasive. White argues that this Court may not set aside his claim solely to provide a distribution to other creditors who appear more deserving and that the doctrine of equitable subordination should not be applied where the purpose is not to achieve equity but rather to punish a party for its past conduct. The cases White offers in support of these propositions are inapplicable in this situation.[34] White asserts that equitable subordination of all or part of his claim would do nothing to achieve equity but would instead simply punish White further for a mistake he made in 1991. White also contends that equitable subordination is inappropriate because he has fully accepted responsibility for his criminal acts and has been sanctioned for those acts.[35] The fact that White has faced criminal sanctions and has paid his debt to society through fines and community service has no bearing on the question of equitable subordination. Equitable subordination re-establishes equality in distribution in bankruptcy by subordinating the legally valid claim of a creditor whose inequitable conduct harmed the debtor or its creditors. Thus, the payment of one's debt to society does not address the equitable issues raised by the harm the claimant's inequitable conduct caused the debtor or its creditors. See Roberts, 15 B.R. at 585–86 (finding that claim of corporate president for salary would be equitably subordinated where he was already in jail for the criminal charges that were the basis of his inequitable conduct). In order to expunge the inequitable conduct and avoid equitable subordination, the claimant must make restitution to the estate. See Porter, 50 B.R. at 520 (inequitable conduct expunged such that claim was not subject to equitable subordination when settlement agreement was made and Trustee received $55,000 for fraudulently conveyed property).

**34.** White cites *Equibank v. Dan–Ver Enterprises, Inc. (In re Dan–Ver Enterprises)*, 86 B.R. 443, 448 (Bankr.W.D.Pa.1988) for the proposition that the Court "cannot set aside the a lien solely to provide a distribution to other creditors who appear more deserving." However, *Dan–Ver* goes on to say in the next sentence: "We can however, subordinate the claim of an officer, director or shareholder who is also a creditor, to the claims of unsecured creditors, when the officer, director or shareholder has used his insider status to conduct inequitable activities." *Id.* Clearly, as discussed in the opinion, *supra*, White used his position as president of Mid–American to make the Hayes Bribe.

White cites the case of *In re Porter*, 50 B.R. 510, 520 (Bankr.E.D.Va.1985) for the proposition that "the doctrine of equitable subordination should not be applied in any case if the purpose is not to achieve equity but rather to punish a party for his past conduct." In the *Porter* case, the court found that a settlement agreement entered into by the claimant and the Trustee which paid $55,000 to the estate for fraudulently conveyed property purged the claimant of the inequitable conduct based on the fraudulent conveyance. *Id.* Therefore, the court would not subordinate the claim where the inequity had been removed. *Id.* White's situation is vastly different. He has made no restitution to or settlement with the bankruptcy estate of Mid–American that would purge him of the inequity of his illegal conduct or mitigate the harm it inflicted on Debtor or its creditors.

**35.** White received a sentence of three years of probation, a $4,000 fine and 200 hours of community service. (Tr. White *111:10–15*).

## CONCLUSION

Although the extent of harm that White caused the Debtor and its creditors is not fully quantifiable, for the reasons set forth above, I find that it is far in excess of the maximum allowable amount of his claim. Therefore, I conclude that equitable subordination of the Employment Claim to the claims of all other creditors is appropriate in this case.