**In re EXIDE TECHNOLOGIES, INC. et al., Debtors.**

**Official Committee of Unsecured Creditors and R2 Investments, LDC, Plaintiffs,**

**v.**

**Credit Suisse First Boston, Individually as Lender and as Administrative Agent, Joint Lead Arranger, Sole Book Manager and Class Representative for a syndicate of banks and other institutions identified herein as the Pre–Petition Banks, and Salomon Smith Barney, Inc., as Syndication Agent, Joint Lead Arranger and Class Representative for the Pre–Petition Banks, Defendants.**

**Bankruptcy No. 02–11125 (KJC).**
**Adversary No. 03–50134.**

United States Bankruptcy Court, D. Delaware.

Aug. 21, 2003.

734

Christopher James Lhulier, James E. O'Neill, Kathleen Marshall DePhillips, Laura Davis Jones, Pachulski, Stang, Ziehl Young & Jones, Wilmington, DE, Matthew N. Kleiman, Kirkland & Ellis, Chicago, IL, for Exide Technologies, Debtor.

Itai David Tsur, Dechert LLP, New York City, for Bank of New York as Indenture Trustee, Trustee.

Aaron A. Garber, David M. Fournier, David B. Stratton, Pepper Hamilton LLP, Adam Hiller, Pepper Hamilton, Anthony M. Saccullo, Eric Michael Sutty, The Bayard Firm, Wilmington, DE, for Official Committee of Unsecured Creditors, Creditor Committee.

William Anthony Hazeltine, Potter, Anderson & Corroon, LLP, Wilmington, DE, for Official Committee of Equity Holders, Creditor Committee.

## MEMORANDUM

KEVIN J. CAREY, Bankruptcy Judge.

### FACTS

On April 15, 2002 ("Petition Date"), the Debtors filed for relief under chapter 11 of the Bankruptcy Code.[1] The Official Com-

---

1. All statutory references herein are to the Bankruptcy Code, 11 U.S.C. § 101 *et seq.,* unless otherwise noted.

mittee of Unsecured Creditors and R2 Investments, LDC ("Plaintiffs") filed the "Complaint and Objection to Claim" [Doc. No. 1] on January 16, 2003, commencing this adversary proceeding. Defendant Credit Suisse First Boston ("CSFB") served and continues to serve as the Administrative Agent, Joint Lead Arranger, Sole Book Manager and Lender under the Pre–Petition Credit Facility for the benefit of the Pre–Petition Banks [Complaint ¶ 13]. Defendant Solomon Smith Barney ("SSB") served and continues to serve as the Syndication Agent and Joint Lead Arranger under the Pre–Petition Credit Facility for the benefit of the Pre–Petition Banks [Complaint ¶ 14]. The Defendants CSFB and SSB are collectively referred to as the Lenders. The Pre–Petition Banks consist of approximately eighty-one banks and other lenders which loaned money and/or extended credit to certain of the Debtors and others [Complaint ¶ 15].

In 1997, the Pre–Petition Banks established a $650 million credit facility for Exide Technologies, Inc. and its borrowing subsidiaries (collectively the "Exide Group") [Complaint ¶ 2]. In 2000, a further loan of $250 million was used to finance the acquisition of a competitor—GNB Dunlop [Complaint at ¶ 2]. In exchange for the financing, members of the Exide Group granted significant additional collateral and guarantees. The effect of the transaction, the Plaintiffs allege, was to increase significantly the Pre–Petition Banks' control over the Exide Group [Complaint ¶ 2]. After the GNB Dunlop transaction closed, Exide's financial condition deteriorated rapidly. On or about October 26, 2001, at the direction of the

Pre–Petition banks, Exide replaced its chief financial officer with a principal of J.A. & A Services, LLC, an affiliate of Alix Partners, LLC ("J.Alix") [Complaint ¶ 5]. Shortly thereafter, the parties amended the loan documents to suspend, temporarily, compliance with certain financial covenants [Complaint ¶ 5] in return for liens on all of the Exide foreign subsidiaries' assets and capital stock [Complaint ¶ 5].

On December 28, 2001, the parties entered into a third amendment to the loan agreement pursuant to which the Pre–Petition Banks agreed to forbear for a period just days longer than the 90–day preference period [Complaint ¶ 6]. Additional collateral and guarantees were given by Exide and certain subsidiaries just outside of the 90–day non-insider preference period [Complaint ¶ 6].

During the period in which these amendments were being negotiated and executed, the Debtors suffered massive losses and became, it is alleged, more insolvent [Complaint ¶ 8]. The Plaintiffs assert that, at this time, the Debtors' directors and management determined that the easiest route was to ally with the Pre–Petition Banks.

On February 27, 2003, the Lenders filed a motion to dismiss the various counts in the Complaint [Doc. No. 16]. After the parties completed briefing, argument was heard by the Court on April 22, 2003.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a), since this adversary proceeding is related to the jointly administered Exide Technologies, Inc. bankruptcy cases.[2] The

---

**2.** To determine whether a proceeding is "related to" a bankruptcy case, the Third Circuit Court of Appeals has said that a court must decide "... whether the outcome of [the civil proceeding] could conceivably have any effect

on the estate being administered in bankruptcy." *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir.1984) (citations omitted), *overruled on other grounds by Things Remembered, Inc. v. Petrarca,* 516 U.S. 124, 134–35, 116 S.Ct. 494,

Plaintiffs allege in their Complaint that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (E), and (O). The Third Circuit Court of Appeals has instructed how to determine whether a matter is a core proceeding as follows:

> To determine whether a proceeding is a "core" proceeding, courts of this Circuit must consult two sources. First, a court must consult [28 U.S.C.] § 157(b). Although § 157(b) does not precisely define "core" proceedings, it nonetheless provides an illustrative list of proceedings that may be considered "core." . . . § 157(b)(2)(A)-(O). Second, the court must apply this court's test for a "core" proceeding. Under that test, " a proceeding is core [1] if it invokes a substantive right provided by title 11 or [2] if it is a proceeding, that by its nature, could arise only in the context of a bankruptcy case."

*Halper v. Halper*, 164 F.3d 830, 836 (3d Cir.1999) (citations omitted). "If the action is core, the bankruptcy court can enter a final order; if non-core, the bankruptcy court is limited to submitting proposed findings of fact and conclusions of law to the District Court." *Continental Airlines, Inc. v. First Security Bank of Utah, N.A. (In re Continental Airlines, Inc.)*, 146 B.R. 534, 535 (Bankr. D.Del.1992); 28 U.S.C. §§ 157(b)(1) and (c)(1).

The parties did not argue or brief the issue of whether or which of the counts of the Complaint are core. I am required to analyze each count separately and have authority to enter a final order only with respect to core matters (*Halper*, 164 F.3d at 839–840), unless the parties consent to the entry of a final order by this court on non-core matters. 28 U.S.C. § 157(c)(2). At the Court's request, the Defendants submitted a letter on August 20, 2003 [Doc. No. 64], expressing their views on

133 L.Ed.2d 461 (1995) (Stevens, J. concurring).

this subject; the letter evidences their § 157(c)(2) consent.

## DISCUSSION

### I. PLAINTIFF R2 INVESTMENTS' STANDING

 The Pre–Petition Lenders first assert that Plaintiff R2 Investments lacks standing to bring the claims asserted in the Complaint, and therefore should be dismissed as a party to the lawsuit. The Lenders advance two arguments in support of this contention. First, a single creditor may not be authorized to maintain the same action as a committee when an "official committee of creditors 'is willing, able, and unhampered by an real or logically-perceived conflicts' from maintaining an action on the debtors' behalf" [Support Memorandum at 42]. *In re Labrum & Doak*, Nos. Civ. A. 98–4780, Civ. A. 98–4913, 2000 WL 1204646, at *1 (E.D.Pa. Aug 23, 2000). Second, R2 Investments is "a particularly bad candidate" to represent creditor interests [Support Memorandum at 43].

The Plaintiffs respond that the DIP Order entered on May 10, 2002 [Doc. No. 218 (02–11125)], and subsequent stipulations and orders provide that any party in interest, expressly including R2, has standing to assert the claims set forth in the Complaint [Opposition Memorandum at 37]. Specifically, the Plaintiffs rely on the Stipulation and Consent Order Extending Deadline to Commence Actions to Challenge Prepetition Obligations and Resolving Related Matters entered into between the Debtors, the Pre–Petition Agent on behalf of the Pre–Petition Lenders, the Committee and R2 approved and entered by this Court on November 27, 2002 [Doc.

No. 1174 (02–11125)]. The Order provides, in pertinent part:

> The Committee and R2, either individually or jointly, shall have the right and standing to commence and prosecute an action asserting Claims and Defenses against the Pre–Petition Agent [CSFB] and/or the Pre–Petition Lenders ... and no further order of Court shall be required for the Committee, R2 or any other party to commence and prosecute such action ... [Consent Order ¶ 1].

However, although the Consent Order expressly grants R2 the right to pursue the claims against the lenders, and for reasons which follow, the Consent Order ought not to insulate R2 from this challenge to its standing. There are additional circumstances that are relevant to the Court's analysis of whether R2 is a proper plaintiff. R2 Investments claims that it is the Debtors' largest unsecured creditor:

> R2, in addition to being the Debtors' largest unsecured creditor, has an economic interest in approximately $15,500,000 of the Deutsche Mark denominated 9.125% bonds issued by certain of Exide Technologies European subsidiaries, and has been appointed an *ex officio* member of the Committee in these cases.

[Complaint ¶ 12].

> At the same time, it is alleged that
>
> an affiliate of R2, R2 Top Hat, Ltd. also holds or has entered into purchase commitments for approximately $81,254,000 of the approximately $700,000,000 under the Pre–Petition Credit Facility. R2 Top Hat. Ltd. does not sit on the Pre–Petition Bank Steering Committee and

limits its participation in bank group meetings.

[Complaint ¶ 12 n. 2]

Furthermore, the Defendants state in their supporting memorandum that "another R2 affiliate, Amalgamated Gadget, LP ('Amalgamated'), sits on the Equity Committee that has been appointed in this case" [Support Memorandum at 43].

The Complaint describes who the Defendants in this adversary proceeding are:

> The relief sought in this action is intended to bind CSFB and SSB and, through each of them, to bind approximately eighty-one banks and other lenders which are, have been, or *may become* members of the syndicate of financial institutions, and their successors ... [a] list of the Lenders, as they existed on or about October 30, 2002, is included as *Exhibit A* hereto.

[Complaint ¶ 15] (emphasis added) [3]

The list of Exide Technologies' Pre–Petition Lender Group provided in Exhibit A includes R2 Top Hat, Ltd [Complaint, Exhibit A at 2].

Due to its planned or possible purchase of a stake in the Pre–Petition Credit Facility, and the identity of the Defendants in this adversary, R2, as a plaintiff, may be suing its own affiliate, R2 Top Hat, through CSFB. While it is alleged generally that R2 Top Hat, Ltd. limits its participation at bank meetings, *no detail about what R2 Top Hat Ltd. does or does not do* at these meetings is provided. R2 is an *ex officio* member of the Committee, while its affiliate, Amalgamated, sits on the Equity Committee. The Creditors' Committee has appealed [Doc. 863(02–11125)] the Or-

---

**3.** In the footnote to Paragraph 15 of the Complaint, the Plaintiffs state that "[s]ubstantially all of the indebtedness outstanding under the Pre–Petition Credit Facility now appears to be held by distressed debt or hedge funds or other so-called 'vulture' investors whose goal, upon information and belief, is to acquire substantially all of the equity in a reorganized Exide Technologies."

der appointing the Equity Committee [Doc. 818(02–11125)].

These additional circumstances and the respective interests and positions of R2 and its affiliates were not highlighted for the Court when it approved the Consent Order that extended the time to pursue actions against the Lenders.

It is well settled that, under certain circumstances, a Court may modify or even vacate a prior order that has been entered. Fed.R.Civ.P. 60(b), as incorporated by Fed. R. Bankr.P. 9024, provides in pertinent part:

> On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; ... or (6) any other reason justifying relief ...

Furthermore, it has been held that the court may act *sua sponte* under Rule 60(b) as incorporated by Bankruptcy Rule 9024. *In re Cisneros*, 994 F.2d 1462 (9th Cir. 1993). "Although Rule 60(b) provides that a court may relieve a party from a final order upon motion, it does not prohibit a bankruptcy judge from reviewing, sua sponte, a previous order." *See In re Lenox*, 902 F.2d 737, 739–40 (9th Cir.1990).

Moreover, the Third Circuit's recent ruling in *Cybergenics* makes clear that a bankruptcy court may utilize its equitable powers to grant a creditors' committee derivative standing to pursue avoidance actions. *Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir.2003).

Based on the foregoing, there is significant doubt about whether R2 is an appropriate representative under the circumstances.[4] At the same time, the Committee, unquestionably an appropriate representative, remains a plaintiff. The Consent Order [Doc. No. 1174] is hereby modified to remove authority for R2's standing and right to pursue this action against the Lenders.[5] Therefore, the Lenders' motion to dismiss R2 Investments, LDC, as a party plaintiff in this adversary will be granted.

## II. MOTION TO DISMISS

### *LEGAL STANDARD*

The purpose of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), made applicable to these proceedings by Federal Rule of Bankruptcy Procedure 7012, is to test the legal sufficiency of the complaint. *Sturm v. Clark*, 835 F.2d 1009, 1011 (3d Cir.1987). When considering a Rule 12(b)(6) motion, the trial court is "required to accept as true all of the allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." *Morse v. Lower Merion School District*, 132 F.3d 902, 906 (3d Cir.1997), *citing, Rocks v. City of Philadelphia*, 868 F.2d 644, 645 (3d Cir.1989),

---

**4.** Courts have held that additional parties, such as creditors, may prosecute actions so long as the (1) the party has the consent of the debtor-in-possession and (2) the court finds that suit by the creditor is (a) in the best interest of the estate, and (b) is necessary and beneficial to the fair and efficient resolution of the bankruptcy proceedings. *In re Housecraft Industries USA, Inc.*, 310 F.3d 64, 70 (2d Cir.2002). Although the Debtors here may have consented to R2's involvement as a

plaintiff, that involvement, for reasons explained above, is neither in the best interest of the estate, nor is it necessary to the bankruptcy case, because the Committee is prosecuting this adversary proceeding.

**5.** This modification also applies to any other order(s) which, arguably, may purport to grant R2 standing to bring this action.

*D.P. Enter. Inc. v. Bucks County Commu-nity College*, 725 F.2d 943, 944 (3d Cir. 1984). A Rule 12(b)(6) motion should be granted "if it appears to a certainty that no relief could be granted under any set of facts which could be proved." *Morse*, 132 F.3d at 906. But a court need not "credit a complaint's 'bald assertions' or 'legal con-clusions' when deciding a motion to dis-miss." *Id., citing, In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1429–30 (3d Cir.1997).

The pertinent inquiry on a motion to dismiss pursuant to Rule 12(b)(6) "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Orr v. Bernstein (In re Bernstein)*, 259 B.R. 555, 556 (Bankr.D.N.J.2001). "In addition to these expansive parameters, the thresh-old a plaintiff must meet to satisfy plead-ing requirements is exceedingly low; a court may dismiss a complaint only if the [P]laintiff can prove no set of facts that would entitle him to relief." *Edwards v. Wyatt*, 266 B.R. 64, 71 (E.D.Pa.2001). The burden of demonstrating that the Plaintiff has failed to state a claim upon which relief may be granted rests on the movant. *Tracinda Corp. v. DaimlerChrysler (In re DaimlerChrysler AG Sec. Litig.)*, 197 F.Supp.2d 42, 55 (D.Del.2002).

### A. Count I: Recharacterization

■■■■ Plaintiffs allege that the $250,000,000 Additional Tranche B Term Loan made to Exide in connection with the GNB Dunlop acquisition should be rechar-acterized as an equity investment and any consideration paid to the Lenders on ac-count of such "investment" disgorged [Complaint ¶¶ 65–73].

[4] ■■■■ generally consider eleven factors in determining whether recharac-terization is proper. These factors in-clude: (i) the names given to the instru-ments, if any, evidencing the indebtedness; (ii) the presence or absence of a fixed maturity date and schedule of payments; (iii) the presence or absence of a fixed rate of interest and interest payments; (iv) the source of repayments; (v) the adequacy or inadequacy of capitalization; (vi) the iden-tity of interest between the creditor and the stockholder; (vii) the security, if any for the advances; (viii) the corporation's ability to obtain financing from outside lending institutions; (ix) the extent to which the advances were subordinated to the claims of outside creditors; (x) the extent to which the advances were used to acquire capital assets; and (xi) the pres-ence or absence of a sinking fund to pro-vide repayments. *See In re Autostyle Plastics, Inc.* 269 F.3d 726, 750–53 (6th Cir.2001) (adopting eleven-factor test set forth in *Roth Steel Tube Co. v. C.I.R.*, 800 F.2d 625, 630–32 (6th Cir.1986)).

■■■ In reviewing the sufficiency of the Complaint to state a claim, the Court may review the loan documents, because they are referred to in the Complaint. *Pension Benefit Guar., Corp. v. White Consol., In-dus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

I conclude that Count I does not set forth a claim for which relief can be grant-ed. Analysis of the loan documents in light of the *Autostyle* factors, reveals the following [6]:

1. *Names given to the instruments, if any, evidencing the indebtedness:* "The absence of notes or other instruments of indebtedness is a strong indication that

---

**6.** The numerical order is for organizational purposes only. See Lenders Support Brief, pp 13–15.

the advances were capital contributions not loans." *Autostyle,* 269 F.3d at 750.

Here there unquestionably are "instruments of indebtedness." First, there is the 1997 Credit Agreement, which was substantially amended and restated, and the 2000 Amendment, which provided for Additional Tranche B Term Loans of up to $250,000,000 under the Pre–Petition Credit Agreement. *See* Pre–Petition Credit Agrt. § 12.9(b). Second, Exide and the Lenders made additional loans by which the parties also executed a document entitled "Additional Tranche B Term Loan Supplement," which set forth the applicable interest rate and specified that the additional loans were being made pursuant to the Pre–Petition Credit Agreement. The term "loan" is used throughout these documents. For example, § 3.1 of the Agreement is entitled "Repayment of Loans; Evidence of Debt."

2. *Presence or absence of a fixed maturity date and schedule of payments:* "The absence of a fixed maturity date and a fixed obligation to repay is an indication that the advances were capital contributions not loans." *Autostyle,* 269 F.3d at 750.

The Pre–Petition Credit Agreement provides both a fixed maturity date and a fixed obligation to repay. The Pre–Petition Credit Agreement states at § 2.3(b) that the Tranche B Term Loans mature in accordance with a quarterly amortization schedule beginning on March 31, 1998 and with a final payment on March 18, 2005. Also, according to § 3.1(a), Exide agreed to repay the Tranche B Term Loans in accordance with the amortization schedule set forth in Section 2.3(b).

3. *Presence or absence of a fixed rate of interest and interest payments:* "The absence of a fixed rate of interest and interest payments is a strong indication

that the advances were capital contributions rather than a loan." *Id.*

Section 3.8 of the Pre–Petition Credit Agreement provides for both a fixed rate of interest and interest payments.

4. *Source of repayments:* "If the expectation of repayment depends solely on the success of the borrower's business, the transaction has the appearance of a capital contribution." *Id.* at 751.

Section 3 of the Credit Agreement sets forth repayment requirements in great length, none of which are tied directly to the success of Exide's business.

5. *Adequacy or inadequacy of capitalization:* "Whether the Debtor was undercapitalized at the time of the transaction, though relevant is not determinative." *In re Phase–I Molecular Toxicology, Inc.,* 287 B.R. 571, 578 (Bankr.D.N.M.2002).

According to the Credit Agreement at § 5.1 ("Financial Condition") and § 5.2 ("No Change") of the Pre–Petition Credit Agreement, Exide represented and warranted that it was solvent and adequately capitalized.

6. *Identity of interest between the creditor and the stockholder:* "If the stockholders make advances in proportion to their respective stock ownership, an equity contribution is indicated." *Autostyle,* 269 F.3d at 751.

Here, the advances were made not by stockholders, and not in proportion to respective stock ownership, but rather by the Lenders pursuant to the provisions of the Pre–Petition Credit Agreement. Section 1 of the Credit Agreement defines "Lender" as a bank or financial institution which becomes a lender. There is no indication in the loan documents that the Lenders are investors or stockholders.

7. *Security, if any for the advances:* "The absence of a security for an ad-

vance is a strong indication that the advances were capital contributions rather than loans." *Id.* at 752.

As Plaintiffs themselves allege, the advances in question are secured by (i) substantially all the assets of Exide Technologies; and (ii) pledged stock and assets of certain foreign subsidiaries of Exide Technologies. Additional security was provided after execution of the Additional Tranche B Term Loans. In addition, by way of example, Section 6.1(a)(ii) provides that one of the conditions precedent to the effectiveness of the Agreement was that the Collateral Agreement had to have been executed and delivered to the Lenders. Section 6 also contains the terms of the pledged stocks and assets of the foreign subsidiaries.

8. *The corporation's ability to obtain financing from outside lending institutions:* "While the fact that the Debtor could not obtain a loan from any other disinterested lender weighs in favor of treating the advance as a capital contribution, [sic] by itself does not tip the scale." *Phase–I,* 287 B.R. at 578.

Here, the Complaint reflects that many lenders were willing to lend to Exide, some of which actually did lend to Exide. A list of those lenders is appended to the Complaint as Exhibit A.

9. *Extent to which the advances were subordinated to the claims of outside creditors:* "Subordination of advances to claims of all other creditors indicates that the advances were capital contributions and not loans." *Autostyle,* 269 F.3d at 752.

The Lenders contend that not only were the Pre–Petition Lenders not subordinate to any other class of creditors, but the holders of the 10% Senior Notes and the 2.9% Convertible Senior Subordinate Notes expressly agreed that their claims would be subordinate to the claims of the Pre–Petition Lenders. Pursuant to § 4.01 of the Indenture for the 2.9% Convertible Senior Subordinate Notes, the holders of those notes agreed that these Notes were subordinated in right of payment to the prior payment in full of all amounts payable under the Pre–Petition Credit Agreement. Similarly, the Lenders contend, the holders of the 10% Senior Notes agreed to be structurally subordinated to the obligations under the Pre–Petition Lenders. While I have found nothing in the record to support this latter contention, the Plaintiffs have not disputed this. Furthermore, the Complaint fails to allege that the advances from the Lenders were subordinated to the claims of outside creditors.

10. *Presence or absence of a sinking fund to provide repayments:* Although "[t]he failure to establish a sinking fund for repayment is evidence that the advances were capital contributions rather than loans," the presence or absence of a sinking fund is insignificant in this case because the loans were fully secured. *Autostyle,* 269 F.3d at 753.

The Plaintiffs themselves allege that the advances were fully secured, as discussed in ¶ 7 above.

Therefore, nearly all of the *Autostyle* factors weigh in favor of a determination that the Tranche B Term Loan is a loan as described and not an equity investment and recharacterization is inappropriate. Count I of the Complaint will be dismissed.

### B. *Insider Claims: Counts III & IV*

■ The Plaintiffs have alleged several claims that depend, in part, on a finding that the Lenders were insiders of Exide. Section 101(31) defines the term "insider" to include a number of class of persons. The Plaintiffs rest their insider claims on the assertions that the Pre–Petition Lender group was a "person in control of the

debtor" as provided in § 101(31)(B)(iii). Generally, the Plaintiffs allege that the Lenders exerted financial leverage over Exide, through Exide's indebtedness to the Lenders, in a manner that effectively permitted the Lenders to control Exide. The Lenders argue that they were not insiders because the existence of financial leverage alone is not a sufficient basis for a cause of action requiring insider status. The Lenders also argue that the Plaintiffs' allegation that the Lenders "indirectly controlled" Exide through a consultant falls short of the necessary showing of operational control.

Lending institutions have been found to be insiders when exerting "dominion and control," or, when they "exercise sufficient authority over the corporate debtors so as to unquantifiably dictate corporate policy and the disposition of assets." *Aluminum Mills Corp. v. Citcorp North America, Inc. (In re Aluminum Mills Corp.)*, 132 B.R. 869, 894 (Bankr.N.D.Ill.1991). The *Aluminum Mills* Court found that the important distinction is the "distinction between the existence of 'control' and the exercise of that control to direct the activities of the debtor." *Id., quoting Matter of Clark Pipe & Supply Co., Inc.*, 893 F.2d 693, 701 (5th Cir.1990). The Court looked to whether the Plaintiff Committee alleged both a source of power and alleged instances in which power was exercised. *Aluminum Mills*, 132 B.R. at 895. The Plaintiffs argue that the Complaint alleges conduct that falls squarely within *Aluminum Mills*.

The Complaint alleges that the Banks initiated the GNB Dunlop transaction, when Exide was already insolvent, and provided both underwriting services and the financing necessary for the transaction [Complaint ¶¶ 36–37]. The Complaint further alleges that the Banks initiated this transaction while, as both lender and in-

vestment banker, they possessed material, non-public information that the other creditors of Exide did not have [Complaint ¶ 87]. As a component of the GNB transaction, the Lenders required Exide to pledge 100 percent of the capital stock of its domestic subsidiaries, 65 percent of the stock in each of Exide Europe and Exide Asia, which together owned, either directly or indirectly, substantially all of the stock in the Exide foreign subsidiaries, and were granted UCC security interests in substantially all of Exide's assets [Complaint ¶ 40]. The Plaintiffs have alleged that the Lenders dictated when the Debtors' bankruptcy petitions would be filed and which of the Debtors' entities would be include in such filings in an effort to prevent liens and guarantees granted by Exide to the Lenders from being avoided [Complaint ¶¶ 54, 57]. The bankruptcy petitions were filed on the first business day falling more than 90 days after the last of the significant collateral grants by the Debtors, ostensibly, to avoid preference claims [Complaint ¶ 54]. The Debtors' foreign subsidiaries, which actually issued the guarantees and collateral pledges, have been kept out of the bankruptcy cases or any other kind of insolvency proceeding [Complaint ¶ 54]. Finally, the Complaint does allege that the banks used their financial leverage to cause the board of directors of Exide to make certain key decisions, such as causing Exide to replace its existing Chief Financial Officer with a principal of J. Alix [Complaint ¶ 46].

Viewing the insider allegations in a light most favorable to the Plaintiffs, the Plaintiffs have alleged sufficiently both a source of power and instances in which the power was exercised by the Lenders.

### 1. *Count III: Equitable Subordination*

 Count III of the Complaint alleges a claim for equitable subordination pur-

suant to § 510(c) and disgorgement of all consideration paid to the Pre–Petition Lenders and their agents on account of the subordinated claims. The parties agree that to state a claim for equitable subordination, a plaintiff must plead three elements: (i) the defendant must have engaged in some type of inequitable conduct; (ii) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the defendant; and (iii) equitable subordination must not be inconsistent with the provisions of the Bankruptcy Code. *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 986–87 (3d Cir.1998).[7]

■ When the defendant is an insider, the standard for finding inequitable conduct is less exacting. *See Fabricators*, 926 F.2d at 1465; *See also In re Mid–American Waste Systems, Inc.*, 284 B.R. 53, 70 (Bankr.D.Del.2002). "Courts have generally recognized three categories of misconduct which may constitute inequitable conduct for insiders: (1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) [defendant]'s use of the debtor as a mere instrumentality or alter ego." *See Mid–American Waste*, 284 B.R. at 70; *Fabricators*, 926 F.2d at 1467. "To qualify as inequitable conduct, the insider or fiduciary creditor must have actually used its power to control the debtor or its position of trust with the debtor to its own advantage or to the other creditors' detriment." *See Mid–American Waste*, 284 B.R. at 70; *Citicorp*, 160 F.3d at 987.

Viewed under the Rule 12(b)(6) standard, I conclude that the equitable subordination count is sufficiently plead.

As to the first and second elements of the standard for equitable subordination, the Complaint avers:

84. There are many types of inequitable conduct that satisfy the first prong of equitable subordination ... These include gross misconduct such as fraud and overreaching to the detriment of other creditors, the exertion of excessive control over a debtor to the benefit of the wrongdoer or to the detriment of other creditor ... unfairness to other creditors in terms of bankruptcy results, breach of fiduciary duty and aiding and abetting breach of fiduciary duty. As detailed below, CSFB's, SSB's and the Pre–Petition Banks' inequitable conduct fits within all of these defined categories of inequitable conduct:

(a) CSFB, SSB and the Pre–Petition Banks induced Exide Technologies to proceed with the GNB Dunlop acquisition in order to gain overwhelming influence and leverage over Exide Technologies, which they later used to firm up their control of the Exide Group and obtain additional collateral and guarantees (while providing minimal if any consideration to the Debtors in exchange) to the detriment of the Debtors' unsecured creditors;

(b) In the fall of 2001, CSFB, SSB and the Pre–Petition Banks engaged in inequitable conduct by using their massive financial leverage and control over the Debtors (and their non-Debtor Domestic and Foreign Subsidiaries) to: (a) install a friendly party as Exide Technologies' chief financial officer; (b) compel the

---

**7.** The Defendants argue that when the defendant is not an insider, the burden on the plaintiff is greater and the plaintiff must prove gross or egregious conduct amounting to "fraud, overreaching or spoliation" [Support Memorandum at 23]. *In re Fabricators,* *Inc.,* 926 F.2d 1458, 1465 (5th Cir.1991). I have already concluded that the Plaintiffs have pled sufficiently that the Lenders are "insiders," so I need not analyze the equitable subordination count under this heightened standard.

grant of substantial additional liens and guarantees in the approximately 100 days prior to the Petition Date (and in the case of certain non-Debtor Foreign Subsidiaries, even following the Petition Date); and (c) dictate the date when the Debtors' petitions would be filed and which of the Debtors' subsidiaries and affiliates would be place in bankruptcy proceedings so as to prevent these liens and guarantees from being subject to avoidance;

(c) CSFB, SSB and the Pre–Petition Banks aided and abetted the Directors' breach of their fiduciary duties to the Debtors' unsecured creditors for the reasons set forth in Count II [of the Complaint]; and

(d) The actions described herein also constitute a breach of CSFB's and SSB's and the Pre–Petition Banks' fiduciary duties owed to the Debtors and the Debtors' creditors.

85. In addition, at the time of this inequitable conduct, the Debtors were solvent and thus the Directors as well as CSFB, SSB and the Pre–Petition Banks (as insiders of the Debtors) owed fiduciary duties to the Debtors' unsecured creditors . . .

87. In taking the aforementioned actions, CSFB, SSB and the Pre–Petition Banks:

(a) had full access to the books and records of the Debtors;

(b) had full opportunity to determine the then existing financial condition of the Debtors;

(c) had full opportunity to asses, with all relevant information, what the financial condition of the Debtors would be after each decision (i) to provide funding to the Debtors; (ii) to cause the Debtors to grant additional collateral, pledges and guarantees without providing reasonably equivalent value in return; (iii) to cause

the Debtors to pay or reimburse fees, including professional fees and expenses of the Pre–Petition Banks; and (iv) to cause the Debtors to not file timely petitions; and

(d) had full opportunity to determine what the Debtors' ability would be to pay their obligations as they came due in the ordinary course of business including obligations owed to general unsecured creditors . . .

89. CSFB, SSB and the Pre–Petition Banks took unfair advantage of the Debtors by virtue of their insider positions and control over the Debtors.

90. All of this inequitable conduct resulted in a transfer of substantial value to the Pre–Petition Banks to the direct detriment of general unsecured creditors. Moreover, the delays in filing the Debtors' petitions caused by CSFB's, SSB's and the Pre–Petition Banks' thinly disguised effort to prevent the avoidance of these liens and guarantees further injured unsecured creditors as the estates became more and more insolvent.

91. By reason of the foregoing, the Debtors' general unsecured creditors were harmed as they could recover on their claims only after CSFB, SSB and the Pre–Petition Banks were paid out and the value of the Exide Group was allowed to deteriorate.

[Complaint ¶¶ 84–91].

Thus, the Plaintiffs allege that conduct was inequitable and injury occurred as a result of:

(a) the promotion and handling of the ill-fated GNB acquisition, while receiving substantial transactional fees for its work related to the acquisition;

(b) taking substantial collateral when the lenders knew that Exide's position

was deteriorating rapidly and a bankruptcy appeared evident; and

(c) delaying the filing of the bankruptcy petitions (and choosing which debtors would file) in order to protect its liens and collateral from avoidance attack.

The motion of the Lenders to dismiss Count III of the Complaint will be denied.

### 2. Count IV: Insider Preference Claim

■■■ Count IV of the Complaint seeks to avoid liens allegedly given as preferential transfers to insiders pursuant to § 547. Section 547(b)(4)(B) allows avoidance of transfers that occurred *"between 90 days and one year* before the date of the filing of the petition, if such creditor at the time of such transfer was an insider ..." rather than the 90-day period for non-insiders. The Lenders' initial argument is that because the Lenders are not insiders and the transfers occurred outside of the 90 day period, there can be no liability under § 547. I have already concluded that the Plaintiffs have pled sufficiently the insider status of the Lenders.

Count IV alleges that the Lenders are insiders and that the collateral pledges were made within one year prior to the Petition Date [Complaint ¶¶ 98, 101]; the pledges were on account of antecedent debt; were pledged while the Debtors were insolvent; enabled the Lenders to receive more than they would have received under a Chapter 7 liquidation than if such transfers had not been made; and were pledged either to or for the benefit of insiders [Complaint ¶ 101]. This is sufficient to state a claim for avoidance under § 547.

■■■ The Lenders' second argument attacks the "trilateral preference theory" alleged in the alternative in the Complaint. The theory is as follows: the Plaintiffs allege that transfers by the debtors to the Lenders on account of an antecedent debt guaranteed by an insider may be avoided as an insider preference, even though the Lenders may not themselves be insiders. The 1994 amendment of § 550, adding subsection (c), overruled *Deprizio, Levit v. Ingersoll Rand Fin. Corp.,* 874 F.2d 1186 (7th Cir.1989) and the line of cases adopting its rationale. The legislative history states "[t]his section overrules the *Deprizio* line of cases and clarifies that non-insider transferee should not be subject to the preference provision of the Bankruptcy Code beyond the 90–day statutory period." H.R.Rep. No. 103–835, 103rd Cong., 2d Sess. 19–20 (Oct. 4, 1994), U.S.Code Cong. & Admin.News 1994, pp. 3353, 3354. Section 550(c) is inapplicable, since it states that "the trustee may not recover ... from a transferee that is not an insider." The Plaintiffs' insider allegations having been adequately pled, the Lenders' motion to dismiss Count IV will be denied.

### C. Counts V & VI: Bankruptcy Code Fraudulent Transfers

■■■■■ Lenders assert that Count V and Count VI of the Complaint, alleging avoidance of fraudulent transfers must be dismissed. Count V alleges avoidance of collateral pledges and guarantees as fraudulent transfers pursuant to § 548(a)(1)(B) (constructive fraud) and Count VI challenges the same transfers, but under § 548(a)(1)(A) (actual fraud).

#### 1. Constructive Fraud

To state a claim for relief under § 548(a)(1)(B), a plaintiff must allege that (1) the alleged transfer was made or incurred within one year before the date of the filing of the petition, (2) the debtor did not receive reasonably equivalent value for the property transferred, and (3) one of the following: (a) the debtor was insolvent on the date such transfer was made or

such obligation was incurred, or became insolvent as a result of such transfer or obligation; (b) the debtor was engaged in business or transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonable small capital; or (c) the debtor intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured. 11 U.S.C. § 548(a)(1)(B)(i)—(iii).

The Complaint sets forth the following:

105. The guarantees and pledges granted by the Debtors other than Exide Technologies were within one year of the Petition date, (i) such transfers were made within one year of the Debtors' bankruptcy filing; (ii) the transferors received less than equivalent value in exchange for their guarantees and pledges; and (iii) the transferors clearly were either insolvent at the time the guarantees and pledges were made, or, at the very least, were rendered insolvent as a result of the above tests.

106. The Debtors other than Exide Technologies that issued guarantees or pledges on or after April 16, 2001, did not receive reasonably equivalent value or fair consideration in return therefor given that they had no right to borrow under the Pre–Petition Credit Facility [Complaint ¶ 106].

107. The Debtors other than Exide Technologies received little, if any, other measurable benefit therefrom.

108. In addition, Exide Technologies did not receive reasonably equivalent value or fair consideration in return for the security interests and pledges it granted on or after April 16, 2002, to the Pre–Petition Banks in connection with the Pre–Petition Credit Facility.

109. At all times from and after March, 2000, the Debtors were insolvent on a balance sheet test, were engaged in business or a transaction or were about to engage in business or a transaction for which any property remaining with the Debtors was an unreasonably small capital and the Debtors intended to incur, or believed that they would incur, debts beyond the Debtors' ability to pay as such debts matured.

110. Accordingly each of the guarantees and asset pledges made by each of the Debtors (including Exide Technologies) ... should be avoided as fraudulent conveyances ... [Complaint ¶¶ 105–110].

Thus, the Complaint clearly sets forth a claim for avoidance of fraudulent transfers.

I turn now to the Lenders' arguments for dismissal. The Lenders argument is threefold: (1) as a matter of law, any transfer made to secure new or antecedent debt is a transfer for reasonably equivalent value, and thus cannot be a fraudulent conveyance; (2) the Lenders provided other valuable consideration by agreeing to forbear from exercising remedies under the Pre–Petition Credit Agreement; and (3) the collateral transfers by the other Debtors (other than Exide Technologies) were subject to a "savings clause" which limited liability of each guarantor [Support Memorandum at 38–42].

First, the Lenders argue that because the collateral transfers were to secure a loan, it is reasonably equivalent value. *Anand v. Nat'l Republic Bank of Chicago*, 239 B.R. 511, 517 (N.D.Ill.1999). The value received by the debtor is its access to the loan proceeds, and by granting collateral, it either gets access to new funds or retains access to previously advanced funds. *Id.* at 518. Thus, the Lenders argue, a debtor, by definition receives value when it

secures a debt. 11 U.S.C. § 548(d)(2)(A).[8] In essence, the Lenders argue that there is a per se rule that transfers to secure a new or antecedent debt always constitute reasonably equivalent value. *Anand,* does not support this proposition. In fact, the District Court in *Anand* viewed itself as being unable to adopt a per se rule in light of Seventh Circuit precedent. *Anand,* 239 B.R. at 517, citing *Barber v. Golden Seed Co.,* 129 F.3d 382, 387 (7th Cir.1997).

■ The Third Circuit requires that a court follow the "totality of circumstances" test in determining whether a transaction "'conferred realizable commercial value [that was] reasonably equivalent value to the realizable commercial value of the assets transferred [here, the guarantees, pledges, and security interests].'" *See Peltz v. Hatten,* 279 B.R. 710, 736 (D.Del. 2002) *quoting Mellon Bank, N.A. v. Official Committee of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.),* 92 F.3d 139, 148–149 (3d Cir.1996). Thus, market value is an important component of the test. In addition, the test involves "a host of other factors, including the good faith of the parties, the difference between the amount paid and the fair market value, and whether the transaction was at arms length." *See Peltz,* 279 B.R. at 736–37 *citing R.M.L., Inc.,* 92 F.3d at 148. The outcome of this test often depends on the facts of each case. *Peltz,* 279 B.R. at 736. This is the case here. The value of the collateral guarantees and pledges necessarily requires an evidentiary record from which a court may rule.

The Lenders' second argument—that forbearance constitutes reasonably equivalent value—requires an inquiry similar to that required for the collateral transfers. The value of the forbearance may constitute reasonably equivalent value, but only based on a showing of what the value of the forbearance was. Therefore, a dismissal based on the asserted (or assumed) value of the Lenders' forbearance is not appropriate.

Finally, the Lenders argue that, as a matter of law, the upstream guarantees given by the remaining debtors (not including Exide Technologies), and the collateral that secured those guarantees, are not fraudulent conveyances. Section 10.1(c) of the Pre–Petition Credit Agreement expressly limits each guarantee so that "maximum liability" of each guarantor subsidiary "shall in no event exceed the amount which can be guaranteed by such Subsidiary Guarantor under applicable federal and state laws relating to insolvency of the debtors" [Support Memorandum, Ex. A]. The Lenders' argue that § 10.1(c), a "savings clause," destroys essential elements of a fraudulent transfer claim.

First, the savings clause, if enforceable, merely saves a portion of a transfer of collateral that might be avoided in its entirety if a Court deems the transfer to violate the fraudulent transfer or conveyance laws. This is supported by the clause itself, which states that the guarantees themselves will be limited to the extent that they would violate the insolvency laws of fraudulent transfers. Thus, the clause limits the fraudulent transfer claim to the exact amount that would render the Debtors insolvent, an amount not yet determined. The Lenders fail to cite any decision in support of the efficacy of the "savings clause."

---

8. The definition contained in § 548(d)(2)(A) is unhelpful for this inquiry since it merely defines value, not reasonably equivalent value, which is a requirement in determining a fraudulent transfer. *BFP v. Resolution Trust*

*Corp.,* 511 U.S. 531, 535, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994) (stating that of the three critical terms "reasonably equivalent value," only the last ["value"] is defined).

For the foregoing reasons, the Lenders' motion to dismiss Count V will be denied.

### 2. *Actual Fraud*

 Count VI of the Complaint seeks avoidance of collateral pledges and guarantees as actual fraudulent transfers pursuant to § 548(a)(1)(A). To plead successfully avoidance under § 548(a)(1)(A), a plaintiff must allege that such transfer was made with actual intent to hinder, delay or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted. Similar to their arguments against the fraudulent transfer claim under § 548(a)(1)(B), the Lenders argue that when reasonably equivalent value exists, there cannot be an intent to hinder, delay or defraud, because the existence of such value means that the debtor's estate is unimpaired for fraudulent conveyance purposes [Support Memorandum at 41].

 To prove an intent to hinder, delay or defraud creditors under § 548(a)(1)(A), courts do examine, *inter alia*, a lack of reasonably equivalent value received by the debtor. *See, e.g., In re Martin's Aquarium, Inc.*, 225 B.R. 868, 875–76 (Bankr.E.D.Pa.1998). I have already concluded that the Plaintiffs have properly set forth a claim that reasonably equivalent value was lacking. An analysis of wrongful intent is a question of fact for the court. The Lenders' motion will be denied as to Count VI.

### D. *Counts VII, VIII, IX, X & XI*

 Counts VII, VIII, IX, X and XI, seek avoidance of various alleged fraudulent transfers/conveyances and preferential transfers under applicable sections of the Uniform Fraudulent Transfer Act and the Uniform Fraudulent Conveyance Act. While the UFCA and its successor, the UFTA, are similar, they are not identical and vary from state to state. Moreover, the Plaintiffs have failed to identify the state(s) whose laws apply to these claims. Therefore, I will grant the motion to dismiss as it pertains to Counts VII through XI, with leave to amend the Complaint to rectify these deficiencies.

### E. *Count II: Aiding and Abetting Breach*

 Count II of the Complaint alleges that the Lenders aided and abetted the Debtors' breach of their fiduciary duties to the Debtors' unsecured creditors. The parties agree, that to state a claim for aiding and abetting breach of fiduciary duty, the Plaintiffs must plead four elements: (i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) a knowing participation in the breach by a defendant who is not a fiduciary, and (iv) damages are proximately caused by the breach. *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del.2001).[9] The Lenders argue that two of these elements are missing: (1) knowing participation by the Lenders, and (2) the underlying breach of fiduciary duty [Support Memorandum at 29–31].

First, the Complaint alleges that the Debtors' directors repeatedly breached their fiduciary duties by favoring the banks to the detriment of the Debtors' unsecured creditors. The Complaint alleges that the Directors:

(1) approved the GNB Dunlop acquisition at a time when the debtors were insolvent, while market conditions were continuing to decline and while the

---

**9.** The briefs on both sides cite to Delaware law, so for the purpose of this ruling, I will apply Delaware law.

Debtors were facing future economic uncertainties, thereby allowing the Lenders to acquire overwhelming economic leverage resulting in de facto control over Exide;

(2) granted the Lenders additional collateral pledges and guarantees far in excess of the value of any new credit provided;

(3) replaced the existing CFO with a principle of J. Alix;

(4) authorized the payment or reimbursement to the professionals of the Lenders for significant fees in connection with the GNB Dunlop acquisition and other transactions;

(5) failed to timely file insolvency petitions;

(6) failed to file voluntary petitions for non-Debtor subsidiaries and foreign subsidiaries that granted collateral pledges and guarantees to the Banks; and

(7) failed to file bankruptcy petitions at a time in which the new collateral and guarantees could have been avoided as statutory preferences within the 90 day period [Complaint ¶ 76].

Second, the Complaint alleges that the Lenders knowingly participated in these breaches by, among other things:

(1) inducing the GNB Dunlop transaction and providing investment banking services and financing in connection therewith;

(2) using their financial leverage to cause the Debtors to replace their existing CFO with the principal of J. Alix;

(3) insisting that the Debtors pay the Lenders' professional fees;

(4) preventing the Debtors from timely filing insolvency petitions;

(5) preventing the Debtors from filing insolvency petitions for domestic and foreign subsidiaries which granted collateral pledges and guarantees to the Lenders; and

(6) preventing the Debtors from filing petitions in which certain liens and guarantees could be avoided as preferences within the 90 day period [Complaint ¶ 77].

The Lenders argue that the Plaintiffs admit a business judgment justification for the GNB Dunlop transaction [10] and therefore the aiding and abetting breach claim fails. The claim is not based only on the GNB Dunlop transaction. As set forth above, there are numerous other instances and acts alleged which support a claim for aiding and abetting the Directors' breach of fiduciary duty. Therefore, the Lenders' motion will be denied as to Count II.

### F. Count XII: Deepening Insolvency

■ Count XII alleges a claim for deepening insolvency.[11] The Plaintiffs allege that the Lenders caused the Debtors to acquire GNB Dunlop so that they could obtain the control necessary to force the Debtors fraudulently to continue its business for nearly two years at ever-increas-

---

**10.** The Complaint provides:

By acquiring a competitor, Exide Technologies believed that the pressure on the Exide Group's pricing would be relieved, administrative costs could be consolidated and its profitability and liquidity would be improved. The Debtors may also have felt that the GNB Dunlop acquisition would help Exide Technologies solve the liquidity issues it was then facing [Complaint ¶ 33].

**11.** The Court of Appeals for the Third Circuit has described this tort as "an injury to the Debtors' corporate property from the fraudulent expansion of corporate debt and prolongation of corporate life." *See Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 347 (3d Cir.2001).

ing levels of insolvency [Complaint 160–167]. The conduct by the Lenders caused the Debtors to suffer massive losses and become more deeply insolvent, costing creditors substantial value.

The Lenders have put forth six arguments in support of dismissing the deepening insolvency claim. They are: (1) a deepening insolvency action is not recognized under Delaware law; (2) the Plaintiffs have not alleged that the Lenders committed an actionable tort; (3) there are no allegations that the Lenders had a duty to Exide or Exide's creditors; (4) allegations of fraud are not plead in detail and do not comply with Fed.R.Civ.P. 9(b); and (5) the claim is defeated by the *in pari delicto* doctrine [Support Memorandum at 32–37].

I must first determine whether a deepening insolvency claim is cognizable under Delaware law. The Supreme Court of Delaware has not spoken on the tort of deepening insolvency.[12] For this reason, I must predict how the Delaware Supreme Court would rule on the claim if such claim was presented to it. *See Wiley v. State Farm Fire & Casualty Co.*, 995 F.2d 457, 459 (3d Cir.1993). To do this, the Court must examine:

(1) what the Delaware Supreme Court has said in related areas;

(2) the "decisional law" of the Delaware intermediate courts;

(3) federal appeals and district court cases interpreting the state law;

(4) decisions from other jurisdictions that have discussed the issue we face here.

*See Wiley*, 995 F.2d at 459–60 *quoting Gruber v. Owens–Illinois, Inc.*, 899 F.2d 1366, 1369–70 (3d Cir.1990). The first two inquiries do not yield authority that is helpful, so I must look to federal cases that have interpreted deepening insolvency claims.

The Third Circuit has recently analyzed a deepening insolvency claim. *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340 (3d Cir.2001). *Lafferty* involved the bankruptcy of two lease financing corporations which allegedly operated as a Ponzi scheme. To operate the scheme, an individual, aided by others, allegedly caused the corporations to issue fraudulent debt certificates, which were then sold to individual investors. The corporation was unable to pay investors and filed for bankruptcy. The Committee, on behalf of the estate, brought two claims in District Court alleging that third parties had fraudulently induced the corporations to issue the debt securities, thereby deepening their insolvency and forcing them into bankruptcy. The District Court held that it could not rule out the possibility of a cognizable injury. On appeal, the Court of Appeals had to determine whether deepening insolvency was cognizable under Pennsylvania law.

The Court of Appeals held that three factors "would persuade the Pennsylvania Supreme Court to recognize 'deepening insolvency'" as giving rise to a cognizable injury in the proper circumstances. *Lafferty*, 267 F.3d at 352. These factors were the: (1) soundness of the theory; (2) growing acceptance of the theory among courts; and (3) remedial theme in Pennsylvania law (when there is an injury). *Id.* The Court found that the theory of deepening insolvency, particularly in the bankruptcy context, was a sound one. *Id.* at 349–50. Furthermore, the Court found that the

---

**12.** The briefs on both sides cite to Delaware law, so for the purpose of ruling on Count XII, I will apply Delaware law.

"[g]rowing acceptance of the deepening insolvency theory confirms its soundness." *Id.* at 350. The Court then cited numerous cases in which deepening insolvency was found to give rise to a cognizable injury. *Lafferty,* 267 F.3d at 350–51. Finally, the Court determined that "one of the most venerable principles in Pennsylvania jurisprudence, and in most common law jurisdictions for that matter is that, where there is an injury, the law provides a remedy." *Id.* at 351, *citing 37 Pennsylvania Law Encyclopedia,* Torts § 4, at 120 (1961).

*Lafferty* instructs that the first two factors are met. For the third factor, the Delaware Supreme Court has stated that the "function of a damage award in a civil litigation is to provide just and full compensation to a plaintiff who suffers injury or loss by reason of the conduct of the tortfeasor." *Maier v. Santucci,* 697 A.2d 747, 749 (Del.Supr.1997), *citing Jardel Co. Inc. v. Hughes,* 523 A.2d 518, 528 (Del. Supr.1987). Thus, Delaware adheres to the same principle as Pennsylvania referred to in *Lafferty.*

Therefore, based on the Third Circuit's decision in *Lafferty* and the Delaware courts' policy of providing a remedy for an injury, I conclude that Delaware Supreme Court would recognize a claim for deepening insolvency when there has been damage to corporate property.

The tort of deepening insolvency has been pled sufficiently by the Plaintiffs. *In pari delicto* is an affirmative defense. *Lafferty,* 267 F.3d at 355. A plaintiff is not required to plead in the complaint all requirements for a claim as well as contemplate and plead in anticipation of all

affirmative defenses that may lie against such claim. The Lenders may raise the doctrine in their answer to the Complaint. The Lenders' motion to dismiss Count XII will be denied.

### G. *Count XIII*

Count XIII seeks a declaratory judgment regarding the equity in repurchased receivables of the Debtors. It is alleged that pre-petition, the Debtors securitized its accounts receivable through a Special Purpose Entity ("SPE") subsidiary [Complaint ¶ 169]. The receivables were expressly exempted from the general grants of collateral made in favor of the Lenders [Complaint ¶ 170]. After the Debtors filed the bankruptcy cases, and upon approval of its debtor-in-possession financing ("DIP") the Debtors unwound the securitization by repurchasing the receivables which were, in turn, pledged as collateral for the DIP Facility [Complaint ¶ 171]. The Debtors allege that under § 552 [13] the Lenders cannot improve their collateral positions by having their pre-petition liens extend to these receivables or the actual cash value of such [Complaint ¶ 172]. The Lenders have offered no argument in favor of dismissing Count XIII.

When viewed in light of the 12(b)(6) standard, Count XIII is sufficiently plead. Section 552 is clear that, with certain exceptions that are inapplicable to these alleged facts, pre-petition liens cannot attach to property acquired post-petition. Therefore, the motion to dismiss is denied as to Count XIII.

### H. *Counts XIV, XV, XVI, XVII & XVIII*

Counts XIV through XVII seek relief related in the form of disgorgement of

13. Section 552(a) provides:
Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before commencement of the case.

fees, expenses, adequate protection payments and the turnover of property. These claims relate to and are predicated on the success of the Plaintiffs' other claims, already discussed. The motion to dismiss, as it pertains to the other claims, has been denied. Thus, the motion to dismiss Counts XIV, XV, XVI, XVII is also denied.

Count XVIII is an objection to the claims of the Lenders pursuant to § 502. The Complaint states that "[t]o the best of the Committees' knowledge and information, no such proof of claim has yet been filed by CSFB or SSB, nor has any other of the Pre–Petition Banks filed a proof of claim against the Debtors" [Complaint ¶ 196]. The Complaint further states that the Plaintiffs expect that "CSFB, SSB and/or other members of the Pre–Petition Banks will file one or more proofs of claim against the Debtors" [Complaint ¶ 196]. Therefore, the Plaintiffs have objected to claims that do not yet exist and for which no relief can be granted. For these reasons, the Lenders motion to dismiss is granted and Count XVIII is dismissed, without prejudice, for failure to state a claim upon which relief may be granted.

Finally, the Lenders argue that a defendant class cannot be certified. The class issue is best handled through the class certification process as provided by the Federal Rules. Therefore, I do not consider here any issues related to class certification.

An appropriate Order follows.